PEOPLE v CHRISTEL

Docket No. 98748. Argued May 2, 1995 (Calendar No. 9). Decided
    August 15, 1995. Rehearing denied 450 Mich 1211.

David J. Christel was convicted by a jury in the Macomb Circuit
    Court, John B. Bruff, J. of first-degree criminal sexual conduct.
    The Court of Appeals, REILLY, P.J., and CONNOR, J. (MICHAEL J.
    KELLY, J., dissenting), affirmed in an unpublished opinion per
    curiam, holding that expert testimony regarding battered
    woman syndrome was properly admitted to assist the trier of
    fact in understanding the claimant's testimony and actions
    (Docket No. 140721). The defendant appeals.

    In an opinion by Justice RILEY, joined by Chief Justice
BRICKLEY, and Justices BOYLE, MALLETT, and WEAVER, the
Supreme Court *held:*

    Expert testimony regarding the battered woman syndrome is
admissible only when the witness is properly qualified and it is
relevant and helpful in understanding an issue in the case.

    1. Expert testimony is permitted if the evidence is from a
recognized discipline, as well as relevant and helpful to the
trier of fact and presented by a witness qualified by knowledge,
skill, experience, training, or education. When appropriate, a
qualified expert may explain the generalities or characteristics
of battered woman syndrome. However, admissibility of syn-
drome evidence is limited to a description of the uniqueness of
a specific behavior brought out at trial. The expert may not
testify that the complainant was a battered woman or comment
on whether the complainant was truthful or testify that the
defendant is a batterer or is guilty of the crime.

    2. In this case, it was questionable whether the complain-
ant's testimony and actions would be incomprehensible to
average people. On this record, however, admission of expert
testimony was error. Thus, the trial judge abused his discretion
in admitting the testimony, but the error was harmless in light
of other physical and corroborating evidence of abuse.

    Affirmed.

    Justice CAVANAGH, joined by Justice LEVIN, concurring in
part and dissenting in part, stated that use of the battered
woman syndrome evidence should be limited to the narrow

purpose of rebutting an inference that the complainant's post-incident behavior is inconsistent with that expected of rape victims. Such an inference normally would be created by an impeachment of a complainant's trial testimony either by the prosecutor or the defendant or by a challenge to the complainant's postincident behavior by the defendant. However, an expert witness should be allowed to testify only about the specific characteristics of the syndrome that are relevant to the particular case. The jury then can readily reach its own conclusion about whether the complainant's behavior, which appears inconsistent with that of most rape victims, has been explained by the syndrome. The purpose of the evidence has been achieved. A limiting instruction to the jury will mitigate improper use of the evidence. There is no reason to additionally allow an expert to testify about the particular case on trial, because the marginal probative value is substantially outweighed by the danger of unfair prejudice.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Carl J. Marlinga,* Prosecuting Attorney, *Robert J. Berlin,* Chief Appellate Lawyer, and *Richard J. Goodman,* Assistant Prosecuting Attorney, for the people.

*Jerald R. Lovell* and *Dennis A. Johnston* for the defendant.

Amicus Curiae:

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Donald Martin,* President, Prosecuting Attorneys Association of Michigan, *John D. O'Hair,* Prosecuting Attorney, and *Timothy A. Baughman,* Chief, Research, Training and Appeals, for the Prosecuting Attorneys Association of Michigan.

RILEY, J. At issue in this case is the admissibility of expert testimony regarding the battered woman syndrome when offered to assist the jury in understanding the complainant's testimony and actions. We hold that expert testimony regarding

the battered woman syndrome is admissible only when it is relevant and helpful to the jury in evaluating a complainant's credibility and the expert witness is properly qualified.

Generally, battered woman syndrome testimony is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse. If relevant and helpful, testimony regarding specific behavior is permissible. However, the expert may not opine whether the complainant is a battered woman, may not testify that defendant was a batterer or guilty of the instant charge, and may not comment on the complainant's truthfulness. Moreover, the trial court, when appropriate, may preclude expert testimony when the probative value of such testimony is substantially outweighed by the danger of unfair prejudice.

In this case, the expert testimony was arguably relevant and helpful in understanding complainant's actions in tolerating physical abuse over a period of years. Moreover, it may have been relevant in explaining why complainant did not report similar incidents earlier. On the other hand, its relevance did not reach the level found in other battered women cases that have considered this issue.[1] Complainant did not remain in the relationship until the date of the assault and try to hide or deny the abuse, did not delay reporting this incident, and did not later retract the claim of abuse. Instead, complainant testified that the relationship ended one month before the assault, explained that she immediately reported the sexual assault, and has consistently maintained that the

[1] See parts II(A) and (C).

abuse occurred. Although the testimony was arguably relevant and helpful, on these facts, we are persuaded that a more direct connection and factual premise is necessary, and, hence, we deem the trial court's decision to admit the testimony to be error.

Nonetheless, we deem the error harmless in light of the limited nature of the testimony and the other physical and testimonial evidence of abuse. The expert merely explained the characteristics of a battered woman. He neither testified that complainant's behavior was consistent with such traits, nor opined about complainant's truthfulness or whether complainant was a battered woman. Combining the physical evidence of sexual abuse with complainant's testimony, we are persuaded that the limited nature of the expert testimony could not have affected the jury's decision to convict. Accordingly, we reverse the decision of the Court of Appeals with respect to admission of this expert testimony, but affirm the result because of the harmless nature of the testimony.

I

Defendant was charged with first-degree criminal sexual conduct,[2] breaking and entering an occupied dwelling with intent to commit criminal sexual conduct,[3] and breaking and entering an occupied dwelling with intent to commit larceny.[4] A jury acquitted defendant of both breaking and entering charges, but convicted him of first-degree criminal sexual conduct. The trial court sentenced defendant to fifteen to twenty-five years in prison.

[2] MCL 750.520b; MSA 28.788(2).

[3] MCL 750.110; MSA 28.305. Alleged to have occurred on January 23, 1990.

[4] MCL 750.110; MSA 28.305. Alleged to have occurred on January 25, 1990.

For several years before this incident, defendant and complainant shared an on-again, off-again romantic relationship.[5] At one point, they lived together with defendant's mother and later moved into their own apartment. However, this latter arrangement ended after about a week, on December 13, 1989, when heated arguments and physical abuse compelled complainant to ask defendant to move out.[6] Complainant testified that this ended their relationship, whereas defendant claimed that the relationship continued nonetheless until the date of this alleged assault. At the time of the assault, complainant was six months pregnant with defendant's child.

At trial, complainant testified that their relationship began well, but later progressed into both verbal and physical abuse. Defendant apparently became extremely jealous of complainant; he accused her of dating other men and became angered at any intimation that she was looking at other men in person, on television, or in pictures. This jealously often turned to rage and beatings, followed by compelled sexual intercourse. Complainant described this behavior as being a "game" for defendant. Indeed, a neighbor confirmed the rage and persistent behavior, testifying that defendant frequently came to complainant's apartment demanding to see her, and that she would refuse to let him in and tell him to leave. On many occasions, the neighbor observed defendant lurking in the laundry room waiting for complainant to arrive home.

On the afternoon of January 23, 1990, complain-

[5] They dated from 1984 to 1985 and then again from 1988 to 1989, shortly before the alleged incident.

[6] Complainant had the apartment manager change the deadbolt lock on the door and place the apartment in her name only. Apparently, however, the main door lock remained the same and thus defendant still possessed a key.

ant testified that defendant entered her apartment by breaking the chain lock on the door.[7] After verbal abuse, he proceeded to slap her with an open hand and eventually to rape her. The rape occurred after defendant grabbed complainant by the neck and forced her face into a pillow while stating: "this is what you want, this is what you are going to see your boyfriend for, I can do it better than he can." In doing so, he scratched and left "hickeys" on the back of her neck. As a result of the intercourse, complainant endured premature labor contractions and accompanying pain. Despite knowing of the contractions, defendant immediately left the apartment after the incident.[8] Complainant then drove herself to the hospital.

When complainant arrived at the hospital, she was crying and had bruises and scratches on her body and dried blood on her lip.[9] She was treated for premature labor and remained in the hospital overnight. Doctors and nurses performed a rape test and noticed that her vaginal area was red and swollen. Thereafter, hospital personnel notified the police, resulting in complainant's consultation with Sergeant Fred Reid regarding her allegation of rape.

When released from the hospital, complainant stopped at her apartment to retrieve some clothing

[7] However, defendant testified that complainant invited defendant to the apartment, that he knocked on the door, and that he was asked inside. Although defendant possessed a key to the apartment, he did not use it on January 23, 1990.

[8] Despite the contractions, by defendant's own testimony, he left and said he would call her later. If the contractions persisted, defendant testified, he would come back and take complainant to the hospital.

[9] Dr. Jensen testified that some of the injuries possibly could have been self-inflicted, except for the scratches that, because of the angle of the cuts, probably could not have been self-inflicted. Defense counsel attempted to explain these scratches by eliciting that they most likely were inflicted by someone with long nails. When defendant testified, he stated that he neither had long nails on January 23, 1990, nor on the date of the trial.

and drop off some material regarding the police investigation. She then went to stay with her mother. The following day complainant returned to her apartment and noticed that the damaged chain lock was missing, along with the pillow case used to muffle her screams, two business cards from Sergeant Reid, and an audio tape from the answering machine, which allegedly contained harassing messages from defendant. In an open cookbook, however, she found several written notes left by defendant describing complainant as a liar, a cheat, and other more graphic and profane names. He also made threatening remarks like "make my morning" and questioned how she could accuse him of rape. At trial, the cookbook was admitted into evidence. Defendant admitted writing these notes and taking the business cards,[10] but denied taking anything else.

During cross-examinations and defendant's presentation of his case, complainant was portrayed as a liar, a perjurer, a self-mutilator, and an embezzler. Defendant produced several witnesses who allegedly saw defendant and complainant together on New Year's Eve, 1989, and several family members who saw them together after December 13, 1989, the date complainant said the relationship had ended. Defense counsel also elicited from complainant instances in which she engaged in self-mutilation, e.g., burning herself with a cigarette, in order to get defendant's atten-

[10] Defendant stated that complainant telephoned him and told him to go to the apartment and take these cards. Defendant theorized that she brought the rape charge in retaliation for defendant's threat to report a series of incidents in which complainant stole from her employer. Defendant telephoned Sergeant Fred Reid, whose name was on the business card, and denied the rape charge. Sergeant Reid testified that defendant admitted searching the apartment on January 25, 1990. Defendant then told Sergeant Reid that he found some money orders and wanted to file a report that complainant had stolen money from her employer.

tion.[11] Defendant's theory was that complainant pursued the rape charge in retaliation for threats that defendant would report complainant's embezzlement from her employer.

To rebut some of these claims and to help evaluate complainant's credibility, the prosecution called in its case in chief a clinical psychologist, Dr. Louis Oken, who was trained in the field of domestic violence and the battered woman syndrome. Over defendant's objection, Dr. Oken described the syndrome and explained that women often remain in a relationship with a boyfriend or husband even though abuse is occurring. The syndrome develops in stages, beginning with minor beatings and progressing to more severe beatings, followed by a period of nonviolence. During this period, the battered woman begins to deny, repress, or minimize the abuse rather than be outraged. He noted, however, that people react differently depending on one's well-being and living situation, thus making it difficult through initial consultations to determine whether a person is in a battering situation.

Because he had never treated complainant or defendant, Dr. Oken limited his testimony to generalities associated with the battered woman syndrome. Accordingly, he did not indicate whether complainant's behavior was consistent with a battered woman, did not give an opinion whether this particular complainant suffered from the battered woman syndrome or that defendant was a batterer, did not opine whether he thought complainant was being truthful, and did not comment on defendant's guilt.

In closing arguments, both sides stressed the credibility of its witnesses. Defense counsel said

[11] The record reveals that complainant readily admitted these types of acts.

complainant was not credible and that the intercourse was consensual, whereas the prosecution contended that she was credible, that her claims were consistent with physical evidence of sexual assault, and that uninterested medical personnel relayed this information. With respect to Dr. Oken, the prosecutor theorized that from complainant's testimony and Dr. Oken's rendition of the syndrome

> you have to be convinced that she, in fact, was a battered woman, and falls into the criteria that he gave you. She went back and tried to work out that situation after sustaining numerous beatings, and you can't understand that, and I can't understand that, but he tells you that it is not a reasonable conclusion, but it is something that women do all the time.

After conviction, defendant sought review in the Court of Appeals, which affirmed the conviction. Unpublished opinion per curiam of the Court of Appeals, issued December 9, 1993 (Docket No. 140721) (MICHAEL J. KELLY, J., dissenting). The Court of Appeals majority held that the expert testimony was properly admitted in order to assist the trier of fact in understanding the evidence.[12] "While the average person without special knowledge might reject the complainant's testimony that she remained in an abusive relationship off and on for over a year as incredible, the expert testified that it is actually quite common for people who

[12] The Court also held that evidence of prior instances of sexual abuse did not violate MRE 404(b) "because it was not an effort to prove defendant had a bad character[, but] [r]ather, it was an effort to place the charged activity in context so that the jury could better appreciate the competing claims of force and consent." Slip op at 1. The Court further rejected claims that the verdict was against the great weight of the evidence, that the jury verdict demonstrates jury confusion, and that his sentence was inappropriate. These issues are not before this Court.

suffer physical abuse at the hands of someone they love to continue in relationships with their abusers." Slip op at 1.

On December 29, 1994, this Court granted leave to appeal limited to the issue whether evidence of the battered woman syndrome was admissible.[13]

II

Before permitting expert testimony, the trial court must find that the evidence is from a recognized discipline, as well as relevant and helpful to the trier of fact, and presented by a witness qualified by "knowledge, skill, experience, training, or education . . . ." MRE 702; *People v Beckley*, 434 Mich 691; 456 NW2d 391 (1990). On request, the trial judge may deem a limiting instruction appropriate and, in certain cases, may exclude the testimony because the probative value of the syndrome evidence is substantially outweighed by the danger of unfair prejudice. MRE 403; *Beckley, supra* at 725 (opinion of BRICKLEY, J.); *id.* at 741 (opinion of BOYLE, J.). On appeal, our duty is to review the decision to admit such testimony for an abuse of discretion.[14]

A

The expert testimony in this case involved what has become known as the battered woman syndrome. Dr. Lenore Walker in her book, *The Battered Woman* (New York: Harper & Row, 1979), brought to the forefront this concept and explanation of abuse between husband and wife and boy-

[13] 447 Mich 1048.

[14] See *Spalding v Spalding*, 355 Mich 382, 384-385; 94 NW2d 810 (1959); *Dacon v Transue*, 441 Mich 315, 328-329; 490 NW2d 369 (1992); *Poet v Traverse City Osteopathic Hosp*, 433 Mich 228, 251; 445 NW2d 115 (1989).

friend and girlfriend. Dr. Walker defined a battered woman as

> a woman who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without any concern for her rights. Battered women include wives or women in any form of intimate relationships with men. Furthermore, in order to be classified as a battered woman, the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman. [*Id.* at XV.]

Dr. Walker notes that a battering or abusive relationship often results in criminal litigation either against the abuser or the abused who retaliates. When the precipitating facts of the syndrome are offered into evidence in either case, the syndrome is not easily conceptualized by lay persons.[15] Accordingly,

> [e]xpert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any "common sense" conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs that the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage. [*State v Hodges,* 239 Kan 63, 68-69; 716 P2d 563 (1986), summarizing *The Battered Woman, supra* at 19-31.]

---

[15] The battered woman syndrome is a subcategory of posttraumatic stress disorder. *Bechtel v State,* 840 P2d 1, 7 (Okla Crim App, 1992).

In most cases, the battered woman syndrome is offered by the defendant in a case of homicide in which the defendant is claiming self-defense. As one court has explained:

> [E]xpert scientific evidence concerning "battered-woman's syndrome" does not aid a jury in determining whether a defendant had or had not behaved in a given manner on a particular occasion; rather, the evidence enables the jury to overcome common myths or misconceptions that a woman who had been the victim of battering would have surely left the batterer. Thus, the evidence helps the jury to understand the battered woman's state of mind. [*State v J Q,* 130 NJ 554, 574; 617 A2d 1196 (1993).]

Although we do not express approval or disapproval of this use, we note that our Court of Appeals recently recognized that a majority of jurisdictions favor the admissibility of expert testimony on the issue of the battered woman syndrome when offered as a means of self-defense. See *People v Wilson,* 194 Mich App 599, 603; 487 NW2d 822 (1992), citing anno: *Admissibility of expert or opinion testimony on battered wife or battered woman syndrome,* 18 ALR4th 1153.

The instant case, however, falls in the minority of situations in which the evidence is offered to help evaluate the credibility of the complainant instead of exculpating the accused. Use of expert testimony in this situation is an issue of first impression for this Court. Nonetheless, our recent decision in *Beckley, supra,* and decisions from our sister jurisdictions guide our analysis.

B

In *Beckley,* this Court addressed whether expert testimony regarding the rape trauma syndrome is

admissible in child sexual abuse cases in order to rebut the inference that the victim's behavior was inconsistent with that of an actual sexual abuse victim. In a plurality opinion, we held that this expert testimony is generally admissible when the scientific or technical evidence is from a recognized discipline, the testimony is helpful to the trier of fact in understanding relevant evidence, and the expert is qualified. *Id.* at 711 (opinion of BRICKLEY, J.); *id.* at 736-737 (opinion of BOYLE, J.). Assuming these tests are satisfied, the expert may testify regarding the characteristics of the syndrome and whether the complainant's behavior is consistent with those traits.[16]

However, seven justices agreed that syndrome evidence is not admissible to demonstrate that abuse occurred. *Id.* at 724 (opinion of BRICKLEY, J.); *id.* at 734 (opinion of BOYLE, J.); *id.* at 744 (opinion of ARCHER, J.). The Court also agreed that the expert may not give an opinion about whether the complainant is being truthful or the defendant is guilty. Moreover, five justices agreed that where syndrome evidence is merely offered to explain certain behavior, the *Davis/Frye*[17] test for recognizing an admissible science is inapplicable.[18] *Beckley, supra* at 721, 734.

The basis for the three separate opinions in *Beckley* stemmed from disagreement regarding the necessary foundation for and the parameters of this expert testimony. Justice BRICKLEY[19] would limit its admission " 'for the narrow purpose of rebutting an inference that a complainant's post-incident behavior was inconsistent with that of an

---

[16] Opinions of Justices BRICKLEY and BOYLE, respectively.

[17] *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955); *Frye v United States,* 54 App DC 46; 293 F 1013 (1923).

[18] Defendant does not contend that the *Davis/Frye* rule should apply to battered woman evidence.

[19] Joined by Justices LEVIN and GRIFFIN.

actual victim of sexual abuse, incest or rape.' "[20] *Id.* at 710 (citation omitted). Justice ARCHER[21] concurred in part, but would hold that an expert only can testify in generalities and cannot discuss whether the victim's behavior is consistent with that of other abuse victims. *Id.* at 744. On the other hand, Justice BOYLE[22] would allow the expert to testify about these similarities to assist the jury in deciding a fact at issue. *Id.* at 736.

C

Today, we extend the general holding in *Beckley* to expert testimony of the battered woman syndrome so that the expert may, when appropriate, explain the generalities or characteristics of the syndrome.[23] We emphasize, however, "that the admissibility of syndrome evidence is limited to a description of the uniqueness of a specific behavior brought out at trial." *Beckley, supra* at 725 (opinion of BRICKLEY, J.). In other words, we do not adopt the battered spouse syndrome, but will permit testimony regarding specific behavior where relevant and helpful to the factfinder. Furthermore, we extend the prohibitions agreed on by seven justices in *Beckley*—the expert cannot opine that complainant was a battered woman, may not testify that defendant was a batterer or that he is guilty of the crime, and cannot comment on whether complainant was being truthful.[24]

---

[20] Justice BRICKLEY would further hold that the expert may not introduce new facts on the basis of personal observations unless the evidence otherwise would be admissible.

[21] Joined by Justice CAVANAGH.

[22] Joined by then-Chief Justice RILEY.

[23] Because the parties have not argued and the facts do not present it, we do not address whether or when the expert may testify about consistencies between the victim and an actual abuse victim. We save that discussion for another day.

[24] In most cases, these limitations dispel any fear of unfair prejudice.

However, finding that expert testimony is generally admissible on the issue of the battered woman syndrome does not obviate the threshold determinations for every trial court—helpfulness and relevancy. Thus, we turn to the confines of its admissibility and whether the syndrome evidence in this case was relevant and helpful to the jury. We note that defendant does not seriously contest that Dr. Oken was a qualified expert,[25] and he concedes, and we agree, that battered woman syndrome evidence is from a recognized discipline.[26]

D

Generally, expert testimony is needed when a witness' actions or responses are incomprehensible to average people. This may include, for example, when a complainant endures prolonged toleration of physical abuse and then attempts to hide or minimize the effect of the abuse, delays reporting the abuse to authorities or friends, or denies or recants the claim of abuse.[27] Schroeder, *Using*

---

[25] We review a trial court's decision finding an expert qualified for an abuse of discretion. See *Bahr v Harper-Grace Hosps,* 448 Mich 135, 141; 528 NW2d 170 (1995). The determinative inquiry in qualifying an expert is the "nature and extent of knowledge and actual experience . . . ." *Beckley, supra* at 712. Given Michigan's liberal application of expert qualification and a review of Dr. Oken's credentials and experience, it is beyond dispute that he was properly qualified. Simply because he never treated complainant or defendant does not disqualify him. He practices in the area of domestic violence and battered spouses and has read and written extensively in the area. The trial judge did not abuse his discretion in qualifying him as an expert witness.

[26] See *Wilson, supra* at 603, citing 18 ALR4th 1153 ("the majority of jurisdictions favor the admissibility of expert testimony regarding the [battered woman syndrome]"). Dr. Walker's premise and understanding of a battering relationship has been widely accepted throughout the United States, and we now join the majority of jurisdictions recognizing the discipline.

[27] Implicit in all these situations is the factual premise allowing a reasonable jury to infer that the complainant could be a battered

*battered woman syndrome evidence in the prosecution of a batterer,* 76 Iowa L R 553 (1991). Only when those or similar facts are at issue and expert testimony would be helpful in evaluating a witness' testimony is it permissible to admit battered woman syndrome evidence in the prosecution's case in chief.[28]

As one of the first jurisdictions to consider the use of the battered woman testimony against a defendant, the New Hampshire Supreme Court in *State v Baker,* 120 NH 773; 424 A2d 171 (1980), found it relevant and admissible in order to rebut the defendant's evidence that he was insane at the time he attempted to murder his wife. The court found the evidence probative because it offered "an alternative explanation for the defendant's assault on his wife." Because the testimony directly refuted defendant's insanity theory, it was relevant and could not have confused or misled the jury. *Id.* at 775.

In the decade since *Baker,* courts have limited expert testimony to situations in which the complainant endured prolonged toleration of abuse, but hid or denied that it occurred, delayed reporting the underlying assault, or recanted after alleg-

woman within the meaning of Dr. Walker's definition. See, generally, Prendergast, *Evidence—The admissibility of expert testimony on battered woman syndrome under the federal rules of evidence*—Arcoren v United States, *929 F2d 1235 (CA 8, 1991), cert den 112 S Ct 312 (1991),* 65 Temp L R 341 (1992). In this case, this factual premise was present in the record although, for the reasons stated below, other necessary premises were absent.

[28] We agree with the dissenting justice that rebuttal is a purpose or reason for admission of battered woman syndrome testimony; however, it is not the only one. *Post* at 601. Even without specific argument of counsel, the factual premises may trigger popular misconceptions in the minds of the jury, especially because adult jurors have generally experienced relationships from which they develop an understanding of what a reasonable response would be to a given situation. Under a relevant and helpful standard, expert testimony is permitted in limited situations to explain or dispel these misconceptions about a battering relationship.

ing the abuse to have occurred.[29] For example, in *State v Ciskie,* 110 Wash 2d 263; 751 P2d 1165 (1988),[30] the defendant was charged with four counts of raping his girlfriend. At trial, the defendant claimed that the complainant received bruises and lacerations from minor accidents. The defendant also asserted that if he was really hurting her she could have immediately sought medical attention, called the police, or ended the relationship at any time instead of months later. The explicit premise of the defense was that she was a liar and that her behavior was inconsistent with that of an actual abuse victim.

To explain the victim's failure to leave or immediately report these abuses, the trial judge permitted, and the Washington Supreme Court affirmed, the admission of expert testimony regarding the battered woman syndrome. "Neither logic nor law requires us to deny victims an opportunity to explain to a jury, through a qualified expert, the reasons for conduct which would otherwise be beyond the average juror's understanding."[31] *Id.* at 265.

---

[29] Indeed, in *Pruitt v State,* 164 Ga App 247; 296 SE2d 795 (1982), the Georgia Court of Appeals considered the admission of expert testimony regarding the battered woman syndrome and found it to be error in admitting the testimony. The trial testimony was hotly contested with no evidence that the complainant was ever a battered woman. Accordingly, the court found error, but deemed it to be harmless in a bench trial in which the trial judge did not appear to rely on the testimony in reaching his decision. *Id.* at 249. See also *Sanders v State,* 251 Ga 70; 303 SE2d 13 (1983) (battered parent syndrome offered against defendant was error because defendant had not placed her character at issue or raised some defense necessitating such evidence).

[30] The trial judge relied on *Ciskie* in admitting the instant testimony.

[31] While permitting some testimony, the court also approved limiting the testimony when the probative value was outweighed by the danger of unfair prejudice: "The trial court properly found that there was danger of such prejudice if [the expert] were to present to the jury a diagnosis of [the complainant] as a rape victim, and accordingly barred such testimony." *Id.* at 279.

A similar need for expert testimony arose in *Arcoren v United States,* 929 F2d 1235 (CA 8, 1991), in which the complainant recanted her story four months later at trial. Immediately after the rape, the complainant flagged down a police car and reported the rape, recounted the same story to nurses, doctors, and criminal investigators, and, three days after the assault, gave a sworn statement before a grand jury. In what the United States Court of Appeals for the Eighth Circuit described as a "bizarre situation," it held[32] that

> [a] jury naturally would be puzzled at the complete about-face she made [at trial], and would have great difficulty in determining which version of [the complainant's] testimony it should believe. If there were some explanation for [the complainant's] changed statements, such explanation would aid the jury in deciding which statements were credible. . . . [E]xpert testimony regarding the battered woman syndrome provided that explanation to the jury. [*Id.* at 1240.]

Likewise, in *State v Frost,* 242 NJ Super 601; 577 A2d 1282 (1990),[33] the defendant had a three and one-half year relationship with the complainant, interrupted by the defendant's imprisonment on theft charges. When the defendant was re-

---

[32] The court rejected limiting expert testimony only to bolstering an assertion of self-defense. If the evidence would assist the jury in understanding the evidence, the court held, then "it is immaterial whether the testimony is presented by the prosecution or by the defense." *Id.* at 1241.

[33] It would seem anomalous to allow a battered woman, where she is a criminal defendant, to offer this type of expert testimony in order to help the jury understand the actions she took, yet deny her that same opportunity when she is the complaining witness and/or victim and her abuser is the criminal defendant. [*Id.* at 612.]

leased, he returned to the complainant's residence, believing that she was responsible for his conviction. He beat her, cut her arm, and raped her. She initially denied the abuse and told her mother not to call the police. After the victim was treated for a laceration on her arm, she went to spend the day with the defendant and their baby. She also visited the defendant while in jail pending trial.

At trial, the defendant testified that the intercourse was consensual and that the complainant was lying. The court found the expert testimony admissible: "Having heard that she spent the entire day with defendant, the jury quite properly could have concluded—based on the misconception that battered women are free to leave—that, if [the complainant] had indeed been assaulted that day, she would have immediately called for help." *Id.* at 614.

Finally, in *State v Borrelli*, 227 Conn 153; 629 A2d 1105 (1993), the court held expert testimony admissible to explain why the complainant might have immediately reported the crime and then recanted the allegation at the hearing on the motion to dismiss and at trial. She testified at trial that she tied the defendant's hands and feet rather than he tying hers, and that her initial allegations were offered in order to get the defendant arrested so he would be forced to undergo drug treatment. The court noted that the expert testimony "offered a different explanation, one beyond the knowledge and understanding of the average juror—that the statement was true, and the victim's recantation was a pattern of typical behavior consistent with battered woman's syndrome."[34] *Id.* at 171.

[34] Accord *State v Freeney,* 228 Conn 582; 637 A2d 1088 (1994). See also *State v Christiano,* 228 Conn 456, 462; 637 A2d 382 (1994) (expert testimony regarding child sexual abuse accommodation syndrome was admissible to explain a child's delay in reporting the incident).

E

In the instant case, while there may have been some basis for the testimony, we find the necessary factual underpinnings for admission of expert testimony lacking. Certainly there may have been a question why complainant tolerated prolonged abuse without reporting it to authorities or friends. However, defendant never denied that some abuse occurred. Furthermore, complainant testified that the relationship ended one month before the assault and did not attempt to hide or deny the instant sexual assault. Moreover, complainant did not delay reporting this incident, but, instead, immediately sought medical attention with accompanying discussions with police. Two days later, a formal complaint was issued. Complainant also never recanted that the assault occurred.

The prosecution's contention that she remained in the relationship in spite of the abuse does not by itself make it relevant and helpful to a material issue. Indeed, this contention is belied by complainant's own testimony that the relationship ended one month before the incident. Expert testimony usually is not needed to explain alternative prosecution theories, but to explain things not readily comprehensible to an average juror. Because complainant has consistently maintained that the relationship ended in December and there is no evidence that complainant hid or minimized, delayed reporting, or recanted the abuse, we reject the prosecution's contention that the battered woman syndrome was relevant in this case.

On this record, it was questionable whether complainant's testimony and actions would be incomprehensible to average people so that admission of expert testimony was warranted. Our re-

view of the facts leads us to conclude that it was error to admit this testimony. We sympathize with trial judges who face the difficult task whether to admit such testimony in cases where the factual underpinnings are not always clear and identifiable.[35] However, while a bright-line test may not be possible, we believe the foundational confines provided by our sister jurisdictions accurately limit the use of this testimony. Even if there are other permissible uses for the testimony, we are persuaded that the instant case is not one of them. Accordingly, we find that the trial judge abused his discretion in admitting the testimony.

III

Although it was error to admit Dr. Oken's testimony, we find the error harmless in light of other physical evidence of abuse, complainant's testimony, and the *limited* nature of Dr. Oken's offering. Dr. Oken merely described the basic characteristics of the syndrome and the different stages of development. He explained various responses, reactions, and methods of coping. He also indicated that there is no one set of criteria to determine whether a woman is being battered. Indeed, in his practice of counseling, he finds it difficult to determine whether a woman is being battered or the defendant is a batterer even after a number of visits, and that it is impossible to determine after just one visit. In making this observation, he *never* opined whether complainant's behavior was consistent with this general criteria and, in fact, indi-

---

[35] We encourage trial judges to actively question counsel about the exact purpose of the testimony and any expected questioning, testimony, or other evidence that may make the testimony relevant. As with many questions not subject to a bright-line rule, "[t]he ultimate goal is an enlightened basis for the trial court's conclusion of relevance . . . ." *People v VanderVliet,* 444 Mich 52, 91; 508 NW2d 114 (1993).

cated that he never met or treated complainant or defendant. Moreover, he explicitly disclaimed any intimation that complainant was being truthful or that she was a battered woman. While the testimony was lengthy, the substance and application were minimal.

The other testimony, however, revealed more than just a credibility contest. Physical evidence and testimony by medical personnel confirmed that some abusive activity occurred and that defendant was enraged with complainant. Doctors and nurses testified that complainant was crying when she entered the hospital, that she had bruises on her face and body, scratches and hickeys on her neck, and a red and swollen vaginal area. The theory that the injuries were self-inflicted was dismissed in part by the medical personnel who opined that the angle of the scratches could not have been self-inflicted.

Additionally, the cookbook containing notes by the defendant and acknowledged by him at trial corroborated complainant's testimony of verbal abuse and rage toward complainant. Moreover, the testimony from complainant's neighbor regarding defendant's persistence and accompanying rejection by complainant undercut the possibility of consensual intercourse on January 23, 1990. Coupling these facts with complainant's testimony, Dr. Oken's testimony could not have affected the jury's decision to convict. In other words, the limited nature of the testimony could not have given the jury the "much sought-after hook on which to hang its hat." *Beckley, supra* at 722 (opinion of BRICKLEY, J.).

Moreover, the prosecutor's closing statement, which invited the jury to believe that complainant was a battered woman on the basis of Dr. Oken's testimony, was not error in itself. Prosecutors are

permitted to argue the evidence and make reasonable inferences in order to support their case theory. *People v Bahoda,* 448 Mich 261, 282; 531 NW2d 659 (1995). However, given our holding with respect to the testimony itself, we review its effect on the jury's verdict. In this case, we are persuaded that it could not have affected the jury's decision. Dr. Oken testified that he could not even determine whether a person was a battered woman after one visit, let alone without ever treating complainant or defendant. Given that the prosecutor's contention was not evidence[36] and was based on Dr. Oken's general explanation of the syndrome, it could hardly have been enough to tip the scale in favor of conviction.

IV

At issue in this case is the admissibility of expert testimony regarding the battered woman syndrome when offered to explain a complainant's testimony and actions. We hold it admissible only when the witness is properly qualified and it is relevant and helpful in understanding an issue in the case. Typically, this includes an explanation of the complainant denying or minimizing the abuse, delays in reporting, or subsequently recanting the abuse.[37]

In this case, we deem the expert testimony irrelevant and not helpful in explaining any fact in issue. Hence, the trial judge abused his discretion in admitting the testimony. Nonetheless, the limited nature of the testimony, coupled with

---

[36] The trial judge instructed the jury that "[t]he lawyers' statements and arguments are not evidence. They are only meant to help you understand the evidence on each side's legal theories."

[37] However, even assuming the existence of these premises, the trial judge may still exclude the evidence when its probative value is substantially outweighed by the danger of unfair prejudice.

physical and corroborating evidence of abuse, makes the error harmless. Hence, we reverse the Court of Appeals decision with respect to the expert testimony, but affirm the result because of the harmless nature of the testimony.

BRICKLEY, C.J., and BOYLE, MALLETT, and WEAVER, JJ., concurred with RILEY, J.

CAVANAGH, J. (*concurring in part and dissenting in part*). I concur with the majority's conclusion that the expert's testimony about the battered woman syndrome was irrelevant and, accordingly, was erroneously admitted. I further agree with the majority's analysis that the error was harmless. However, for the reasons stated in *People v Beckley,* 434 Mich 691; 456 NW2d 391 (1990), I would limit the use of the battered woman syndrome evidence to the narrow purpose of rebutting an inference that the complainant's postincident behavior is inconsistent with that expected of rape victims. *Id.* at 710 (BRICKLEY, J.), and at 744 (ARCHER, J.). This inference normally would be created by an impeachment of a complainant's trial testimony either by the prosecutor or the defendant or by a challenge to the complainant's postincident behavior by the defendant.[1]

The majority does not address whether it will

[1] The rebuttal purpose is supported by the case law. In *State v Ciskie,* 110 Wash 2d 263, 278; 751 P2d 1165 (1988), the battered woman syndrome evidence was admitted *after* the defense challenged specific postincident behavior of the complainant as being "inconsistent with that of a rape victim." Likewise, in *State v Frost,* 242 NJ Super 601, 614; 577 A2d 1282 (1990), the expert testimony was admitted *after* the defense had attacked the complainant's credibility by emphasizing specific postincident behavior as being inconsistent with that of a rape victim. The court stated that after hearing the defense's allegations,

the jury quite properly could have concluded—based on the misconception that battered women are free to leave—that, if [the complainant] had indeed been assaulted that day, she

allow an expert witness to testify with respect to the complainant's behavior in the particular case. Riley, J., *ante* at 591, n 23. However, I would caution trial courts not to allow such testimony. Once the expert has testified about the specific characteristics of the syndrome that are relevant to the particular case, the jury can readily reach its own conclusion about whether the complainant's behavior, which appears inconsistent with that of most rape victims, has been explained by the syndrome. The purpose of the evidence has been achieved. Consequently, I believe that the marginal probative value of allowing testimony with respect to the specific complainant's behavior is substantially outweighed by the unfairly prejudicial danger that the jury may conclude that the expert, in fact, knows that the complainant has been a battered individual. MRE 403.[2]

would have immediately called for help. It required expert testimony to assist the jury in understanding, not whether [the complainant] was a credible witness on the witness stand, but whether her conduct on [the date of the alleged assault] was consistent with the pattern and profile of a battered woman. [*Id.*]

Similarly, in *State v Borrelli,* 227 Conn 153, 157-158; 629 A2d 1105 (1993), the complainant recanted her earlier statement to the police and during cross-examination by the defense, the complainant testified to a different version of the events, and that she had fabricated her first story with the hope of having the defendant arrested and treated for drug abuse. Thus, the prosecution sought to challenge the complainant's testimony. The court approved of the use of syndrome evidence for the purpose of offering an explanation for the complainant's recantation. *Id.* at 174. Additionally, in *Arcoren v United States,* 929 F2d 1235, 1238-1239 (CA 8, 1991), the complainant recanted her prior allegations at trial and the government offered the expert testimony to explain the recantation. Finally, in *State v Baker,* 120 NH 773, 775; 424 A2d 171 (1980), the syndrome evidence "was offered to rebut the defendant's evidence . . . ."

[2] As Justice Archer explained in his partial dissent in *Beckley:*

Once an expert witness presents evidence disabusing the specific misconception at hand, such as delayed disclosure, syndrome evidence has served its proper function. This function

The majority relies on an analogy between battered woman syndrome and child sexual abuse accommodation syndrome, which was the focus in *Beckley.* I am apprehensive of such unfettered reliance. In *Beckley,* the defendants were convicted of criminal sexual conduct. The child complainants were the alleged victims of that criminal sexual conduct. Therefore, expert testimony with respect to child sexual abuse accommodation syndrome was directly related to the charges that actually faced the defendants. By comparison, in cases such as this case, the defendant has been charged with criminal sexual conduct—not spousal battery. Moreover, the complainant is alleging rape—not spousal abuse. In contrast to the child sexual abuse accommodation syndrome evidence, the battered woman syndrome opens the door to other bad act evidence, which prejudicially places the defendant's character into evidence as a spouse batterer, with the probable and impermissible inference that he acted "in conformity therewith." MRE 404(b)(1). Such evidence is undoubtedly extremely prejudicial. Therefore, I believe that the rationale for precluding expert testimony about the particular complainant is even more compelling than in child sexual abuse cases.

An expert testifying about the battered woman syndrome can adequately furnish the jury with an explanation for illogical postrape behavior of a complainant through general observations and

can be accomplished just as effectively without reference to the complainant before the court. Although the [*Beckley*] lead opinion recognizes that syndrome evidence is, by nature, as highly prejudicial as it is probative, see, e.g., [*id.* at] 723-725 (BRICKLEY, J.), it wholly fails to recognize that the marginal probative value of the expert's testimony with reference to the specific complainant before the court pales in comparison to the increased and substantial degree of prejudice a criminal defendant will face. [*Id.* at 748.]

hypothetical questions.[3] For example, in *State v Ciskie,* 110 Wash 2d 263, 278-279; 751 P2d 1165 (1988), the expert witness was questioned about a hypothetical case history that paralleled the complainant's behavior. On the basis of the hypothetical example, the expert testified that delayed reporting was characteristic of battered woman syndrome.[4]

Similarly, *State v Borrelli,* 227 Conn 153, 174; 629 A2d 1105 (1993), approved of the use of syndrome evidence for the purpose of offering an explanation for the complainant's recantation. As a threshold matter, the court found significant that the expert

> did not examine the victim. He did not offer any opinion as to whether she was a battered woman or whether she exhibited the typical behavioral characteristics of a battered woman. [The expert] did not apply any scientific instrument or test to specific evidence in the case, nor did he use battered woman's syndrome as a diagnostic tool. Finally, he did not apply any scientific test to a hypothetical question posed by the state. Instead,

[3] In *Baker,* the expert witnesses testified about the general nature of battering, and then testified about specific behavior by answering hypothetical questions. *Id.* at 775-776. Likewise, in *Arcoren,* n 1 *supra* at 1239, the expert testified only about general aspects of the syndrome and did not testify about whether the complainant "suffered from or displayed symptoms of the syndrome."

[4] However, the court criticized testimony from the expert that she had examined the complainant and "diagnosed her as suffering from post-traumatic stress disorder." *Id.* at 279. Even though the expert testified that posttraumatic stress could be caused by events other than rape, the court stated that the preferable approach would be to bar diagnosis testimony altogether. *Id.* at 280. The court explained:

> Testimony from a psychological expert on a diagnosis as to whether an alleged victim was in fact raped is troublesome because of a danger of invading the function of the trier of fact. Such testimony often amounts to a comment on the credibility of a witness. [*Id.*]

[the expert's] testimony was based on his observations of a large group of battered women through the lens of his educational background and experience. [*Id.* at 164-165.]

In this case, the majority finds that the expert witness, after explaining the general nature of battered woman syndrome "*never* opined whether complainant's behavior was consistent with this general criteria and, in fact, indicated that he never met or treated complainant or defendant." RILEY, J., *ante* at 598-599 (emphasis in original). The majority finds this fact significant. I believe that this should be the rule that we announce today. The prosecution can readily produce an expert who has had no contact with the individuals involved in the case. Through general testimony and through hypothetical questions the substance of the syndrome can be presented to the trier of fact and the purpose of its use can be achieved. In addition, a limiting instruction to the jury will mitigate improper use of the evidence. I see no reason to additionally allow an expert to testify about the particular case on trial, because the marginal probative value is substantially outweighed by the danger of unfair prejudice.

LEVIN, J., concurred with CAVANAGH, J.