# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee/Cross-Appellant,

v

BRANDON JAMES HARBISON,

       Defendant-Appellant/Cross-
       Appellee.

UNPUBLISHED
January 23, 2018

No. 326105
Allegan Circuit Court
LC No. 13-018686-FC

---

## ON REMAND

Before: MURPHY, P.J., and METER and RONAYNE KRAUSE, JJ.

PER CURIAM.

    A jury convicted defendant of two counts of first-degree criminal sexual conduct, MCL 750.520b(1)(a); attempted first-degree criminal sexual conduct, MCL 750.92 & MCL 750.520b(1)(a); two counts of second-degree criminal sexual conduct, MCL 750.520c(1)(a); and accosting a minor for immoral purposes, MCL 750.145a. Defendant filed a claim of appeal in this Court. Following our decision in *People v Harbison*, unpublished opinion per curiam of the Court of Appeals, issued January 26, 2017 (Docket No. 326105) (*Harbison I*),[1] in which we affirmed defendant's convictions,[2] defendant sought leave to appeal in the Michigan Supreme Court. On October 13, 2017, in lieu of granting leave to appeal, the Supreme Court vacated the portion of *Harbison I* "concerning the testimony of Dr. N. Debra Simms" and remanded the matter to this Court "for reconsideration in light of *People v Peterson*, 450 Mich 349; 537 NW2d 857[, amended 450 Mich 1212] (1995)." *People v Harbison*, 501 Mich 897; 901 NW2d 895 (2017) (*Harbison II*). In all other respects, the Supreme Court denied leave to appeal, reasoning that it was "not persuaded that the remaining questions presented should be reviewed by th[e] Court." *Id*. After reconsidering the issue of Simms's testimony, we again find that it provides no basis for reversing defendant's convictions.

---

[1] Judge Ronayne Krause concurred in result only.

[2] The trial court had granted defendant a new trial based on ineffective assistance of counsel; we reversed that decision. *Harbison I*, unpub op at 1.

-1-

This case involves the sexual abuse of a grade-school-aged girl by her uncle. Several days after the victim first reported the abuse to her foster mother, Dr. Simms examined and interviewed the victim. Dr. Simms testified that she is board-certified in both pediatrics and "the sub-specialty of child abuse pediatrics." She was qualified, without objection, "as an expert in pediatrics with expertise in the field of child sexual abuse diagnostics and treatment." The prosecutor questioned Dr. Simms about her diagnosis, in pertinent part, as follows:

> *Q*. So all that information that you described all came from [the victim].

> *A*. Well it came from [the victim] and sometimes from the foster mom.

> *Q*. The information that you said that [the victim] told you that she was touched by [defendant], that he--all of that information that you just recently described, that was all from [the victim]?

> *A*. Yes ma'am, that was in my taking a history from [the victim] prior to the physical examination.

* * *

> *Q*. What did your physical examination consist of after you got the original history from [the victim]?

> *A*. My physical exam included a head to toe generalized physical examination. It included looking at all of the parts of her body, doing the vital signs, and then it included using the culpascope and looking at the genital and anal area.

> *Q*. Okay. And based upon what [the victim] had told you, would you have expected to find any injury or anything--any physical findings as a result of your exam?

> *A*. No. When she described the genital to genital contact and I asked about any symptoms or sensation during that, she described that it felt uncomfortable but she did not allege any bleeding.

> *Q*. Okay.

> *A*. Without a history of bleeding it is unlikely that we will see any kind of scarring, although scarring is unusual to this area, but I did not expect to see any findings of healed trauma without that history.

> *Q*. And did you find any physical findings?

> *A*. Well she has normal female genital anatomy. The structures looked normal. In looking at her hymenal tissues she was what we call sexual maturity rating 3, so you're born at 1 and she was progressing puberty wise along a stage of development. She had not yet started her periods and she had enough sexual

maturity that that could have happen [sic] at any time. In looking at the hymenal tissues they showed what we call an estrogenized effect, so you could see that she had gone--started going through puberty and had pubertal changes. At the 5:00 position on the hymen there was a very small notch, that's a non-specific finding. So in total her physical exam did not show any acute or remote indications of trauma, just the notch which is a non-specific exam.

*Q*. And what's a non-specific finding? What does that mean?

*A*. A non-specific finding is a finding that we can see for many different reasons and is not specific to any type of trauma to the genital tissues. You can have small notches that occur from events like time events such as the bicycle accident or something of that nature. You can get small notches from children that use tampons. You can get small notches that are actually developmental in nature. So when you have a very shallow very small notch that is less than 50% of the width of the hymenal rim, those are considered non-specific findings.

\* \* \*

*Q*. Did you have a diagnosis based on your exam and history?

*A*. Yes, ma'am.

*Q*. What was that?

*A*. Probable pediatric sexual abuse.

*Q*. And you said that even if there was no other than what you described [sic], her physical exam was normal?

*A*. Yes, ma'am.

*Q*. Was her normal physical exam inconsistent with her description of the sexual penetrations that she suffered?

*A*. No, ma'am. Her disclosure was that there had been contact by--contact by her uncle's mouth to her genital area. You would not expect residual of trauma from that. There was contact by her mouth to his penis, once again you wouldn't expect any kind of physical examination finding from that. She described that there was touching. Children, we diaper them, we change them, we bathe them, we touch them all the time. To examine these children I have to touch them. I have to spread apart these layers and I don't cause any trauma. And then she described genital to genital contact which did not have any bleeding associated with it. So the fact that her physical examination shows non-specific findings with this notch and generally normal genital structures does not negate her history of what occurred to her body.

*Q.* How many attempted penile/anal or genital contact does not leave any marks on the body? Do you have a percentage?

*A.* I personally have had lots of experience in which there has been genital to genital contact and in which there is a normal or a non-specific exam. In our published literature there is a paper, the title of it it's normal to be normal [sic], they took 236 children in which there was a substantiation or conviction in which there was a higher standard than just we think that these children may be abused and so they looked at these 236 children and of those 236 children more than two-thirds of girls with substantiated abuse had normal or nonspecific findings. So it's normal to be normal. When you talk about what the nature of child sexual abuse is the majority of time it's licking, kissing, touching, rubbing, and we would not expect to see scarring or residual trauma from those events.

The trial court questioned Dr. Simms further:

*Q.* Alright. You described your conclusion as probable pediatric sexual abuse.

*A.* Yes, sir.

*Q.* Would you explain to the jury why you consider probable as opposed to maybe possible?

*A.* In an attempt to allow pediatricians that do child abuse evaluations to communicate with one another effectively, what I may look at and say this is concerning, and someone else may say it's suspicious, and someone else may say it's this or it's that, what happened is there became a national cocensus [sic] that we need to look at all of the evaluations and we need to be on the same page. We need to look at how is it that we are evaluating these patients and how are we coming to a conclusion. And, what occurred is that instead of using various and sundry words to describe the outcomes of these evaluations, an attempt was made to standardize this by saying if there is no disclosure of abuse and it is a normal exam with no concerning situations, this means that there are no medical indications of abuse at this time, and that is a negative evaluation. If--other criteria exists [sic] but it's what we would consider a lower form of history. As a pediatrician I cannot always diagnose based solely upon the medical testing such as you referenced or from seeing something on the physical examination. If you come in to see me and you have a headache, I cannot see your headache, but based upon your history of where you tell me it hurts, when it hurts, how it hurts, how it feels, when it comes, when it goes, how often it comes, taking a comprehensive history, I can diagnose stress headache, cluster headache, migraine headache, etcetera, based upon the history. So in child sexual abuse we take the history that the child gives us and based upon how clear, consistent, detailed or descriptive it may be, if that is present with or without physical examination findings, that is probable pediatric sexual abuse. If the child makes a statement but the statement is limited because the child may have a developmental

disability, they may be young, they may not be able to really tell me what has happened to their body, then that can be possible pediatric sexual abuse. They're making a statement but for some reason they're not able to be clear, consistent, detailed and descriptive like with the headache analogy. To get a diagnosis of definite pediatric sexual abuse we have very high tough standards. You have to be pregnant, you have to have a sexually transmitted disease that does not come from anything other than direct sexual contact. There has to be a video, a picture or an eyewitness to you being abused. Or, you have to have physical examination findings that have no other explanation than penetrating trauma to the intervaginal area. That's a really tough standard. So that's our definite. Then clear, consistent, detailed and descriptive history is probable, and then we have the other 2 categories for less than that.

> *Q*. You refer to a WE have this standard. Who is the WE?

> *A*. The WE are the individuals that do pediatric sexual abuse evaluation nationwide, nationwide. We have this standard. So when I'm communicating with Dr. Chris Greely down at Children's Hospital in Texas, when I say I have this then he knows that the criteria that I'm using. So for individuals that do this on a regular basis, there's no rule to it because as a physician you can choose to do what you want to do, but it's basically a practice standard for those of us that are professionals in this field.

In *Harbison I*, unpub op at 6-7, we analyzed the issue of Simms's testimony as follows:

> Defendant also argues that he was denied a fair trial when Dr. N. Debra Simms, the physician who examined the victim at the Safe Harbor Children's Advocacy Center, testified that she diagnosed the victim with probable pediatric sexual abuse. Because defendant did not object to Dr. Simms's testimony at a time when the trial court had an opportunity to correct the alleged error, the claim of error is unpreserved. *People v Pipes*, 475 Mich 267, 277; 715 NW2d 290 (2006). We review unpreserved claims of evidentiary error for plain error affecting the defendant's substantial rights. *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011). Plain error, which is error that is clear or obvious, affects a defendant's substantial rights when it affects the outcome of the lower court proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

> "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier or fact." MRE 704. However, such testimony must be helpful. *People v Smith*, 425 Mich 98, 107; 387 NW2d 814 (1986). A physician who examines a sexual abuse victim may be a proper witness, but if the physician's opinion that sexual abuse occurred is based solely on what the victim told the physician, absent the physician being qualified as an expert in assessing credibility, the opinion will be deemed to be unhelpful. *Id*. at 107, 109, 113.

Although Dr. Simms's diagnosis of probable pediatric sexual abuse was based solely on the victim's statements, her testimony was not plainly erroneous. *Benton*, 294 Mich App at 202. When questioned about the diagnosis, Dr. Simms testified that there was a national consensus about diagnosing child sexual abuse. She explained that she will give a diagnosis of probable pediatric sexual abuse if the child gives a clear, consistent, detailed, or descriptive history, regardless of whether there are physical findings of abuse. Dr. Simms also explained when she will give a diagnosis of possible pediatric sexual abuse or definite pediatric sexual abuse. Dr. Simms never testified whether she found the victim credible or whether she definitively believed that the victim was sexually abused; rather, it appears that Dr. Simms was simply leaning toward taking the victim at her word. Under these circumstances, Dr. Simms's testimony that she diagnosed the victim with probable pediatric sexual abuse did not constitute a clear and obvious error. *Carines*, 460 Mich at 763. In addition, even if we were to conclude that a plain error occurred, we cannot find the requisite prejudice requiring reversal, *id.*, because the testimony, read as a whole, made clear that the physician was simply relying on the victim's word, and the victim herself testified at trial.

After reanalyzing Dr. Simms's testimony in light of *Peterson*, we again find no plain error. In *Peterson*, 450 Mich at 352, the Michigan Supreme Court revisited its prior plurality decision in *People v Beckley*, 434 Mich 691; 456 NW2d 391 (1990), seeking to "determine the proper scope of expert testimony in childhood sexual abuse cases." The *Peterson* Court revisited the issue of when so-called "syndrome" evidence of child sexual abuse is admissible. *Peterson*, 450 Mich at 362-363. Although the *Peterson* Court did "not endorse or adopt the use of the term 'syndrome,' " it explained in a footnote that

> [c]hild sexual abuse accommodation syndrome (CSAAS) is a term that has become [commonplace] in other jurisdictions. It is used to describe the different reactions observed in child victims of sexual abuse. The term originated in an article published by Dr. Roland Summit entitled *The child sexual abuse accommodation syndrome*, 7 Child Abuse & Neglect 177 (1983). The article described five common characteristics observed in child victims of sexual abuse: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted, and unconvincing disclosure, and (5) retraction. [*Peterson*, 450 Mich at 362-363, 371 n 11.]

The *Peterson* Court noted that to be admissible pursuant to MRE 702,[3] expert testimony must first be legally relevant under MRE 402. *Peterson*, 450 Mich at 363. Just as evidence of

---

[3] MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if

"battered woman syndrome" is only admissible under certain circumstances, see generally *People v Christel*, 449 Mich 578; 537 NW2d 194 (1995), the *Peterson* Court decided that "syndrome" evidence of child sexual abuse is only admissible under certain conditions and for limited purposes, *Peterson*, 450 Mich at 370, 373-374. The Court stated that

> "[t]he use of expert testimony in the prosecution of criminal sexual conduct cases is not an ordinary situation. Given the nature of the offense and the terrible consequences of a miscalculation—the consequences when an individual, on many occasions a family member, is falsely accused of one of society's most heinous offenses, or, conversely, when one who commits such a crime would go unpunished and a possible reoccurrence of the act would go unprevented— appropriate safeguards are necessary. *To a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat.*" [*Id*. at 374, quoting *Beckley*, 434 Mich at 721-722 (opinion of BRICKLEY, J.) (emphasis added by *Peterson*).]

The *Peterson* Court held, in pertinent part:

> (1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty. However, . . . (1) an expert may testify in the prosecution's case in chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, and (2) an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility. [*Peterson*, 450 Mich at 352-353.]

With regard to rebutting an attack on the victim's credibility, the Court stated:

> Because the pertinent inquiry is not the timing of the admission, but rather the reason for the use of the evidence, the admission of expert testimony is not confined to the rebuttal stage of proofs and thus may be introduced, as limited by [*Peterson*], in the prosecution's case in chief. When the credibility of the particular victim is attacked by a defendant, we think it is proper to allow an explanation by a qualified expert regarding the consistencies between the behavior of that victim and other victims of child sexual abuse. [*Id*. at 375.]

---

(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In the present case, defendant has argued, both in this Court and when seeking leave to appeal in the Supreme Court, that Dr. Simms, by way of her testimony regarding the diagnosis of "probable pediatric sexual abuse," improperly opined on the "ultimate issue" of whether the alleged sexual abuse actually occurred.

While Dr. Simms testified that she diagnosed the victim with "probable pediatric sexual abuse," the context is vital. Dr. Simms later clarified that "probable pediatric sexual abuse" is a term of art used by "individuals that do pediatric sexual abuse evaluation nationwide[.]" She testified at considerable length that the phrase is merely part of a method intended to allow pediatricians "to communicate with one another effectively" about diagnostic criteria. She also explained those diagnostic criteria to the jury. Specifically, she explained (1) that a diagnosis of probable pediatric sexual abuse can be made "with or without physical examination findings" of abuse, "based upon how clear, consistent, detailed or descriptive" the child's vocalized "history" of the abuse is; (2) that there are three other possible diagnoses; (3) that the least conclusive diagnosis, "a negative evaluation," is made when the patient's examination reveals no evidence of abuse and the patient fails to report any abuse; (4) that the next diagnosis would be "possible" pediatric sexual abuse, which is warranted when the patient reports abuse "but for some reason they're not able to be clear, consistent, detailed and descriptive," for example "because the child may have a developmental disability, they may be young, [or] they may not be able to really [describe] what has happened to their body;" (5) that the next-level diagnosis is the one reached in this case, "probable" pediatric sexual abuse; and (6) that the fourth level of diagnosis, "definite" pediatric sexual abuse, involves the satisfaction of "a really tough standard" requiring corroborating physical, documentary, or eyewitness evidence.

In other words, Dr. Simms never directly opined on the ultimate question in this case— i.e., whether the victim was abused by defendant—she merely stated a medical diagnosis based on established diagnostic criteria, *all of which were explained to the jury*. Moreover, she never stated that she personally, or as an expert, found the victim's account of the abuse to be credible. Rather, she indicated that the victim had provided a history that was "clear, consistent, detailed *or* descriptive[.]" (Emphasis added.) Viewed in context, the testimony did not clearly run afoul of *Peterson's* admonishment that an expert may not vouch for the veracity of the victim or testify that the sexual abuse occurred or that the defendant is guilty. *Id*. at 352. As noted, the *Peterson* Court stated that an expert may testify "regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim" and may explain how the victim's behavior comported with other victims of child sexual abuse, in order to rebut an attack on the victim's credibility. *Id*. at 352-353. The Court, when setting forth these parameters for allowable expert testimony, was concerned with experts who testify about typical *behavioral symptoms* of child sexual abuse, see *id*. at 373, 376, 380, but Dr. Simms simply did not do that.[4] And Dr. Simms did not testify about the typical veracity rate of children when disclosing sexual

---

[4] Dr. Simms did testify that it is typical for child victims of sexual abuse to have no evident physical trauma to their bodies, but she did not testify that the victim's *behavior* was typical of abuse victims.

abuse.  Cf. *id*. at 376.  We simply cannot find a clear or obvious error, see *Carines*, 460 Mich at 763, with regard to Dr. Simms's testimony, even when viewed through the lens of *Peterson*.

We once again affirm defendant's convictions.

/s/ William B. Murphy
/s/ Patrick M. Meter
/s/ Amy Ronayne Krause