# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

KALEB RAYNARDO-CHARLES HAMPTON,

       Defendant-Appellant.

UNPUBLISHED
December 2, 2014

No. 315801
Calhoun Circuit Court
LC No. 2012-003421-FC

Before: FITZGERALD, P.J., and GLEICHER and RONAYNE KRAUSE, JJ.

PER CURIAM.

In *People v Bynum*, 496 Mich 610; 852 NW2d 570 (2014), our Supreme Court examined the parameters of expert testimony concerning gang-related violence. The Court held that while expert testimony regarding gangs may be admitted if relevant under MRE 402 and helpful to the jury under MRE 702, "MRE 404(a) precludes testimony that is specifically used to show that, on a particular occasion, a gang member acted in conformity with character traits commonly associated with gang members." *Bynum*, 496 Mich at 615-616. Because the expert in *Bynum* had impermissibly opined that the defendant acted in conformity with his gang's characteristics, the Supreme Court affirmed this Court's decision reversing the defendant's first-degree murder conviction and remanding for a new trial.

We revisit *Bynum* today. A jury convicted defendant Kaleb Hampton of second-degree murder based in large measure on the testimony of Battle Creek police officer Tyler Sutherland, the same expert who testified in *Bynum*. Here, Sutherland declared that defendant's gang membership provided him the motive, means, and opportunity to commit the charged offenses. Sutherland further expressed that defendant had actively and intentionally participated in the shooting that led to the death of Ledell Anderson. According to Sutherland, defendant committed the crime to elevate his status in the gang hierarchy.

Sutherland's testimony contravened MRE 404(a) and impermissibly invaded the province of the jury. Despite that defendant's counsel raised no objection to most of Sutherland's inadmissible opinion testimony, we reverse defendant's conviction and remand for a new trial.

I.

The events leading to the tragic death of Ledell Anderson began with a birthday party. Brenda Sue Woods, a resident of Battle Creek's Park Hill neighborhood, invited more than 100

-1-

of her friends and neighbors to a celebratory barbeque. The guests gathered on her yard and in the street near her home. Anderson lived in the vicinity but was not a party guest. During the event, he and other neighbors socialized on a nearby porch.

Shortly before midnight, gunshots were fired close to the party's location. Anderson walked to his mother's house to check on her well-being. After verifying that she was unhurt, Anderson began to walk back to the porch. As he crossed the street, a bullet struck him in the chest, killing him.

Two Battle Creek police officers in the immediate vicinity of the gunfire separately sped toward the shots' origin. Officer Shawn Follett almost immediately encountered a white car proceeding rapidly in the opposite direction. Follett activated his emergency lights and attempted to stop the vehicle. The fleeing car continued down Seedorf Avenue with Follett and the second police car in pursuit. It stopped only after turning off Seedorf and onto another street.

The officers found three people in the white car: Darellee Gordon, the driver, defendant Kaleb Raynardo-Charles Hampton occupying the front passenger seat, and Romell Bolden in the back. A search of the vehicle and its three passengers yielded no weapons. However, Follett had lost sight of the car for a brief time on Seedorf. In Follett's estimation "there was a possibility because of those certain locations where I lost sight of the car that something could have been pitched from" it. Police investigators subsequently located two weapons lying on the ground near Seedorf Avenue: a .38-special caliber revolver and a .357-magnum caliber revolver. Gordon's fingerprint was found on the .38-special. According to a Michigan State Police firearm examiner, the .38-special fired the bullet that killed Anderson.[1] Defendant's fingerprints were not detected on either weapon.

Bolden, defendant's compatriot, testified on behalf of the prosecution that he entered the white car believing the trio was headed for Burger King. Instead, Gordon drove through a crowd of people gathered at a street party, then parked farther down the street. Bolden recounted that as the three men sat in the vehicle listening to music, an object hit the car. The car pulled away and turned onto another street. At that point, Bolden "noticed the trunk light was open [sic] so we made another left . . . [Gordon] stopped the car, [defendant] got out, shut the trunk, [and] got back in." In Bolden's view, "whatever hit the back of" the car caused the trunk to open. Bolden claimed that after defendant shut the trunk, someone standing at the end of the street fired two gunshots. He denied seeing any guns in the white car.

The prosecutor elicited from Bolden that he and defendant "hung out with" people in a Battle Creek gang called M.O.B., which stands for "Money Over Bitches." Bolden explained that M.O.B. members "like to hang out" on the south side of Battle Creek. The events in question occurred on the north side of the city. As discussed in greater detail below, a nascent

---

[1] Gordon was tried separately and was convicted of second-degree murder and several other offenses. This Court affirmed his convictions. *People v Gordon*, unpublished opinion per curiam of the Court of Appeals, issued May 22, 2012 (Docket No. 302799). In appears that Bolden was not tried on any charges in connection with this incident.

and rival gang occupied the northerly Park Hill neighborhood. Bolden denied knowledge that defendant actually belonged to M.O.B.

Bolden's testimony undergirded the prosecution's theory that defendant had opened the trunk and retrieved the two revolvers later found on the street. The immediate motive for the shooting, the prosecutor claimed, was payback for the "disrespect" shown by the people who threw the object at the white car. Defendant's broader motive, the prosecution averred, was to stir up a "hornet's nest" by openly venturing—unwanted and uninvited—into north side territory. Sutherland's expert testimony supplied the grist for these prosecution theories, as we will discuss in greater detail.

The prosecutor also presented the testimony of defendant's former jail cell mate, Nathaniel Ashley, who claimed that defendant had confessed involvement in Anderson's murder:

> He told me they were riding around, him and two of his home boys, and they were riding around like . . . in the Northside park over by Walters Street. They rolled down the street or whatever and somebody got to hollering and somebody might of threw something. I'm pretty sure he said somebody threw something at the car. They went down, went to the closest cross street right there, turned around, he said he hopped out, got the guns out of the trunk, hopped back . . . in the car, came back the way they came from and that's when . . . they started shooting.

Ashley clarified that defendant "was shooting." He further professed to having seen defendant with "all the M.O.B. people," "throwing" the gang's signature hand sign.

Battle Creek police officer Tyler Sutherland was the linchpin of the prosecution's case. As the prosecution's supplemental brief on appeal summarizes, "Sutherland's testimony covers well over 100 pages of transcript, and is by far the longest and most detailed testimony of any witness in the trial."

Sutherland is an investigator in the Battle Creek Police Department's Gang Suppression Unit. Based on his training and experience, the trial court qualified him as an expert, just as it had in *Bynum*. As in *Bynum*, Sutherland's testimony began with a general description of "criminal street gang[s]" and the reasons that people join such organizations. He described the colors, symbols, signs, and tattoos that promote a gang's culture and the methods used by police officers to determine gang membership.[2]

Battle Creek gangs, Sutherland explained, draw their membership from "the neighborhood." The recruits identify with the local gang members, often because of familial relationships. According to Sutherland,

---

[2] In this regard, Sutherland expounded at great length about gangs and gang cultures that were totally unrelated to the prosecution's evidence regarding Battle Creek and its gang culture. Much of this evidence was superfluous information and irrelevant. It serviced to improperly inflate Sutherland's credibility as a foremost expert on gangs.

Once they go past that then it turns into basically dedication, are you willing to do whatever it takes, commit any crime required to avenge this respect or disrespect that was just done to your gang. Are you willing to put yourself out there and commit any crime even if it carries a life offense [sic] in the name of the gang, no matter what it takes or who it's against, you have to be basically willing and dedicated.

Sutherland attributed special importance to the concept of "respect": "Gang members look at respect as the driving force behind gangs and gang culture." While a "normal citizen" believes that "you give respect to get respect," gang members believe "you get respect through fear and violence and power." Germane to this case, "No disrespect goes unanswered is kind of a common theme within gang crimes." Sutherland offered several different methods of "disrespect" including "coming onto" the "turf" of a rival gang and "[t]alking to someone's girlfriend." When asked why "respect" plays such an important role in gang psychology, Sutherland replied: "Well, gang members . . . view people as objects not human beings. They're very manipulative. They have a very short fuse. . . . [T]hey need instant gratification. They're not going to work their problems out." Sutherland continued: "They live in the moment and that's why they never consider the consequences if I do this, if I hold this gun out this window, if I pull this trigger, they don't think ten years down the road. They don't think about the innocent people that are going to get hurt by their actions."

The prosecutor turned her focus to the M.O.B. gang, which Sutherland referred to as "the southside gang." Within the M.O.B. structure, Sutherland elaborated, younger gang members form "their own little separate sets." One such subset is called the "One Hundred Block." Through years of investigation, including review of police reports and search warrant applications, Sutherland learned the names of the "older" M.O.B. participants, which he shared with the jury. As to the One Hundred Block, the prosecutor elicited the following testimony:

> *Q.* Now, and again, your intel and your being able to categorize this other group of M.O.B. that's part of M.O.B did you do the same way reviewing the police reports responding to calls whether they were victims or suspects?
>
> *A.* Yes.
>
> *Q.* And did a pattern emerge, the same group of younger individuals were hanging together all the time?
>
> *A.* Yep. As soon as we - - all we had to do was even just take one member of this group, put his name in and all of a sudden were seeing the same seven, eight guys he's consistently associating with, committing violent crime. Not just the police checked them or they were skipping school, it's shooting at people, beating people up, robbing them, breaking into houses, stealing cars. So it was - - it was quite amazing to see this cross-referencing that was taking place just by typing one person's name in and looking at their police reports and cross-referencing all the other peoples' name[s] in their police reports and their records.

Based on his investigative strategies, Sutherland located approximately 53 police reports "that had the center core group of the M.O.B. One Hundred Block guys associating with each other while committing violent crime, not just skipping school but violent crimes." That group, Sutherland testified, included defendant and the other two passengers of the white car: Romell Bolden and Darallee Gordon.

After specifically identifying defendant and the other occupants of the car as known gang members, Sutherland and the prosecutor launched a PowerPoint presentation "to help aid the jury in understanding . . . how the gangs came to be and their signs and symbols[.]" The projected images included generic photographs of gang symbols, signs, and clothing depicting the culture of gangs in California and elsewhere. Sutherland's presentation then shifted to Battle Creek. Sutherland defined the territories of various gangs and outlined gang leadership structure. As he had in *Bynum*, Sutherland delineated the roles of "hardcore," "associate," and "fringe" gang members. Hardcore members, Sutherland expounded, are "known to be the most violent within the group, they won't hesitate to pull the trigger to shoot somebody. . . ." Associates do "anything they can to try to work their way up into the hard core membership." This midlevel gang constituency, Sutherland continued, "sometimes . . . could be the most dangerous because they're the most willing to do whatever it takes to be considered a leader in the gang. So all they care about their whole life is trying to become the next status the next hard core member."

Sutherland then displayed images illustrating the hand signals, graffiti, symbols, nicknames, and territories of rival Battle Creek gangs. The slides included Facebook photographs of various local gang members, including defendant and Gordon. Sutherland honed in on the subject of territory, informing the jury that if a member of M.O.B. went to the north side of the city, "[i]t would cause all kinds of problems." He supported this conclusion by referencing "all kinds of police reports that show th[e] perfect example" of such territorial incursions: "the M.O.B. guys they'd ride up into the Northside turf whether they were trying to start problems or they were just trying to drive thru [sic] and the Northside guys would recognize them and start problems, whether they would shoot at them throw stuff at their car." Sutherland elaborated: "Leading up this incident on April 1st, 2010 . . . we were being told that there were M.O.B. guys riding through trying to pick with the kids in Park Hill." And Sutherland professed awareness that although the "guys in Park Hill" had not yet officially formed a gang, they "were capable of retaliating very easily whether it was with guns, throwing stuff at the car, so the M.O.B. guys knew what was going to happen if they go in there."

Sutherland then looped back to defendant:

> *Q*. Now, specifically with the M.O.B. One Hundred Block and with the defendant in this particular case, you were able to establish that there is this bullseye command structure; correct?

> *A*. Yes.

> * * *

> *Q*. Now, and through your investigation had it then came to your attention on numerous occasions that when you were doing this intel [that] Kaleb Hampton,

-5-

the defendant in this case, was found with this One Hundred Block group or even some of these older M.O.B. people repeatedly as you did your investigation?

A. Yes.

Q. Now, you talked about I'm sure this is a question the jury is going to have, when you were talking about the bullseye command structure where would Kaleb have fallen in this structure?

A. Kaleb would have been in between the associate and hardcore member because his willingness to be in a car that's involved in a shooting, not just that but we'd have other reports where Kaleb was shooting --

Defense counsel objected, based on the absence of any testimony "as to [defendant's] willingness to be in the car that night." The trial court instructed the prosecutor to ask another question. She complied, asking a few general questions about hardcore and associate gang members. The questioning then returned to the night of the shooting:

Q. So at the time of this particular incident April 1st, 2010 . . . there was this in place command structure, sir?

A. Yes.

Q. And at that point in time [defendant] would have been already defined as part of the roster of the M.O.B. One Hundred Block, sir?

A. Yes.

Q. And you had already done at that point in time your investigations that led you to believe that he was in between a[n] associate and hardcore member?

A. At that point *after this incident on April 1st I would classify him and the other officers in the Gang Unit would classify him as a hardcore member due to his escalation and now this incident*. [Emphasis added.]

Sutherland then delved more deeply into the events surrounding Anderson's shooting, highlighting defendant's particular motive, means and opportunity to commit the crime:

Q. Now, with respect to your investigation and the incident that particular night and all your review of the information that was gathered in the investigation, in your expert opinion did the gang membership with respect to M.O.B. One Hundred Block do they provide a defendant in this case a motive to commit the crime?

A. Yes.

Q. And how so?

*A.* Because Kaleb's part of the M.O.B., because he's part of One Hundred Block M.O.B. it gave him motive to show where he stands in the command structure of M.O.B. It shows that he's willing to avenge any disrespect that had taken place, of the bottle being thrown at the car, or an incident may have happened earlier before they came in the area. It gave Kaleb great motive to avenge this disrespect and retaliate with violence to show not only don't mess with my M.O.B. One Hundred Block, but don't mess with me because I'm a very violent hardcore member of this gang, and if you mess with me this is what's going to happen. So he had very strong motive to retaliate as well as the other members in that car that night.

*Q.* Now, further, with respect to gang membership . . . did it provide Kaleb Hampton, the defendant in this case, the means to commit the crime then?

*A.* Yes. It's a saying we say but for the gang. Because Kaleb is part of One Hundred Block M.O.B. M.O.B. provides Kaleb the pool of guns to get the guns from, the team guns, provides Kaleb transportation, so you have multiple gang members which gives you access to multiple cars to do it. You have collective input from other gang members, if Kaleb's by himself trying to execute this he might not get away. He might get shot himself or he might not even go through [with] it. So he has collective input from his other gang members. He has - - all of these things put together allow him to follow through with this. The other thing is if Kaleb's there by himself he might turn around and go the other way. But because the other two gang members are there they say no let's drive through this entire crowd of rival gang members that are already allegedly shooting at us, let's drive towards them into the turf. Because Kaleb's in a gang, this creates a chance to be on rival turf. If Kaleb's not in a gang he doesn't have to worry about turf. If he's on his turf or rivals. But again, because he's part of a gang that creates this turf that he's not supposed to be on.

*Q.* And, again, you had just referenced intel to retaliate for being shot at. Is that intel that you received from reviewing the police reports and the witness statements and having been here when Mr. Bolden had testified?

*A.* Yes.

*Q.* Now, did the gang membership provide the defendant an opportunity to commit this crime?

*A.* Yes. You would look at the motive and means, both of those provided Kaleb the opportunity to get into that car with two other gang members, get into a car that they borrowed because of their gang membership they borrow cars from other people, give him an opportunity to be in a car where there were guns allegedly taken out of the trunk, gives Kaleb the opportunity to now continue driving by while people are shooting out of their car, including Kaleb we believe. It gives him all these opportunities from beginning to end to follow through with all this because he's part of the gang. If Kaleb's not in the gang, he's not there to

begin with. He's not in the car. He doesn't have guns in his trunk. He doesn't go to the trunk and get the guns. They don't drive down into the hornet nest of rival gang members and keep shooting. People aren't - - that are not in a gang they happen to be somewhere and a M.O.B. comes after them, they're going to get out of there. They're not going to keep driving towards the M.O.B. where they're shooting at them. But because Kaleb's in a gang, Darellee's in a gang, Romell's in a gang that gives them the opportunity to following through with their plan now to show not only are they in a gang, they're hardcore members of this gang, and basically respect, respect our gang. You disrespected us now it's time to avenge this disrespect.

All three occupants of the white car, Sutherland opined, invited the "disrespect" event involving the thrown object, and then literally pulled the trigger:

> [S]o for Darellee, Kaleb Hampton and Romell Bolden identified M.O.B. gang members to purposely drive back into that neighborhood knowing who lives there, they know it's Northside turf, they know it's Park Hill turf, but then they purposely drive up there, *they're looking for trouble. They're purposely looking for trouble. They're purposely looking to avenge some type of gang disrespect they felt was done whether at Burger King earlier or once the bottle was thrown at them.* So once they got in there and the bottle gets thrown at them now it's escalating. There's kind of a mathematical equation to disrespect when it comes to gangs. Whatever the rival does to you as a gang member, when you retaliate you have to use an equal or greater level of violence to retaliate. So a bottle being thrown at their car well they have to either equally or greater react, and they decide to react by shooting. When they decide - - here's another thing that leads us to believe the intent of them that night. . . .   [S]o for Kaleb, Darellee, and Romell to get into the car and now drive into this hornets['] nest, *they are purposely as gang members attempting to avenge disrespect.* And to go with that mathematical equation of equal of greater value, whatever was said at Burger King and then the bottle being thrown, they decide to up it to we're going to shoot at all of you to show how powerful we are, how much you should be feared [sic] of us, how strong we are as M.O.B. gang members, and don't mess with us. So that's why they take it about the top level you can and start shooting at a car they weren't intending to hit someone specifically. *They were just intending to shoot at that entire neighborhood that was full of rival gang members to prove a point. They didn't care who they hit, but they were there to care to prove a point of we should be feared and respected.*
>
> *Q.* So there wasn't a specific target, they all were targets basically?
>
> *A.* No, and the other thing that could lead them to just shoot at everybody out both sides of the car is, like I said, you got people all over that. When they go to drive down Hanover you got the Park Hill guys, you got the Northside gang members on both sides of the streets, from behind and front. So they're just basically going to shoot their way out then at this point while they're trying to show this - - avenge this disrespect of how powerful they are as gang members.

*Q.* Not caring whether or not basically creating this risk not caring if they killed somebody when they shot?

*A.* Very, very common theme we have with our gang crimes is a bullet doesn't have names. Gang members in Battle Creek they like to shoot at people to scare them and cause this fear again it helps their respect image of their gang. But they don't necessarily like to walk up to people, put the gun in their face and pull the trigger. Now that happens, but that's usually your real hardcore members trying to send a message. A lot of our drive-by shootings and peoples['] houses getting shot at, or people on the corner getting shot at, they're not necessarily intending to shoot a specific person. Now they might, because they might know somebody that they are trying to shoot. *But a lot of times this incident is a perfect example of Kaleb, and Darellee, and Romell didn't know who specifically they should be mad at, but they knew they should be mad at all of the rival Northside gang members that were up there including Park Hill. So they're just going to shoot out all sides of the car whoever they hit, they hit but they prove their point by showing that they [are] very violent.*

*Q.* And ultimately Ledell Anderson being shot and killed?

*A.* Yes. [Emphasis added.]

Defendant testified on his own behalf. He explained that when he entered the white car, he thought that Gordon would drop him off at his girlfriend's house on the north side of Battle Creek, and that Gordon and Romell would proceed to Burger King. He admitted that he had exited the vehicle and closed the trunk after something hit the car, but denied retrieving any guns or seeing anyone in the vehicle with a gun. Defendant recounted that as the car drove away, he heard gunshots from far away and ducked down inside the car. He then heard more gunshots sounding "kind of close" and conceded that they likely came from the white car. "I had nothing to do with what happened to Mr. Ledell Anderson," defendant asserted. He disclaimed any knowledge of the police reports Sutherland alleged to have contained his name, and denied membership in the M.O.B. "I just socialize with them," he explained, and had flashed gang signs "to let them know I'm cool."

Defense counsel's closing argument urged that Bolden and Gordon were the shooters and had ordered defendant to close the trunk while they prepared to start shooting. Defendant feared retaliation if he identified them as the perpetrators, counsel contended.

The trial court instructed the jury in relevant part:

You've heard evidence suggesting that the defendant may have been involved in other crimes or improper acts for which he is not on trial. This instruction pertains to all the testimony about his alleged participation in the gang at issue in this case. If you believe this evidence you must be very careful only to consider it for a certain purpose. You may only think about whether this evidence tends to show gang membership as that has been defined for you. You must not consider this evidence for any other purpose. For example, you must not decide

that it shows that the defendant is a bad person, or that he is likely to commit crimes. You must not convict this defendant for these offense[s] because you think he may have been guilty of other bad conduct at other times not involved in these particular allegations. . . .

After nearly two days of deliberations and multiple jury notes, the jury found defendant guilty of murder in the second degree, MCL 750.317, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, carrying a concealed weapon (CCW), MCL 750.227, and committing a felony as a gang member, MCL 750.411u. The jury was unable to reach a verdict on the four remaining charges: two counts of felony-firearm, intentionally discharging a firearm from a motor vehicle, MCL 750.234a, and intentionally discharging a firearm at an occupied structure, MCL 750.234b. The trial court declared a mistrial on the unresolved counts and the prosecution agreed not to retry them.

## II. ANALYSIS

We review for an abuse of discretion a trial court's decision to admit evidence. *People v Murphy (On Remand)*, 282 Mich 571, 578; 766 NW2d 303 (2009). "Preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, are reviewed de novo, and it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Bynum*, 496 Mich at 623.

A defendant's failure to preserve a claim of evidentiary error generally forfeits any later objection. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (quotation marks and citations omitted, alteration in original).

Before Sutherland took the stand, defense counsel offered a somewhat muddled objection to portions of his anticipated testimony predicated on counsel's pretrial review of Sutherland's PowerPoint presentation. The mug shot photographs Sutherland intended to show, counsel argued, were more prejudicial than probative and lacked proper foundation. The photos of "several people flashing gang signs, flashing pictures" had "no context to where those pictures are taken," and therefore were also "very prejudicial," counsel contended. The prosecutor rejoined that she had voluntarily redacted some portions of the slide show based on her "belief of the appellate rulings allowing the gang presentations, but not bringing forth other prior bad acts, specific details that relate to this particular defendant[.]"[3] Defense counsel failed to raise an objection premised on MRE 404(a). During Sutherland's lengthy testimony, counsel raised the single foundational objection quoted earlier in this opinion. Counsel's few objections did not relate to the portions of Sutherland's testimony that we now find patently inadmissible.

---

[3] Defendant's case was tried in February 2013. This Court did not issue its decision in *Bynum* until two months later. *People v Bynum*, unpublished opinion per curiam of the Court of Appeals, issued April 18, 2013 (Docket No. 307028).

Accordingly, the plain error standard governs our review. We begin with the gang-evidence principles articulated by our Supreme Court in *Bynum*.

Both "MRE 402 and MRE 702 require[] a trial court to act as a gatekeeper of gang-related expert testimony," which in turn mandates that the court determine whether the testimony is relevant and will assist the trier of fact. *Bynum*, 496 Mich at 625. Sometimes the evidence is necessary simply to expose that a particular crime was, in fact, gang related. *Id*. at 626. "At other times, 'an expert's testimony that the crime was committed in rival gang territory may be necessary to show why the defendant's presence in that area, a fact established by other evidence, was motivated by his gang affiliation.'" *Id*., quoting *Gutierrez v State*, 423 Md 476, 496; 32 A3d 2 (2011). Accordingly, the expert testimony properly may address "general characteristics of gang culture for an appropriate purpose, such as helping to elucidate a gang member's motive for committing a gang-related crime." *Id*. at 626-627. Nevertheless, such evidence must be admissible under MRE 404(a), which provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion . . . ." *Bynum*, 496 Mich at 627.

Sutherland's testimony in *Bynum* ran afoul of MRE 404(a) because it linked the defendant to the specific crimes at issue. The Supreme Court identified the following excerpt of Sutherland's testimony as having crossed the line:

> "[W]hen I see that incident, when I watch the video, they [the gang members, including Bynum] are all posted up at the store with a purpose. When they went to that store that day, they didn't know who they were going to beat up or shoot, but they went up there waiting for someone to give them the chance. 'Make us—give me [i.e., Bynum] a reason to—to shoot [you], to fight you, to show how tough we are, the Boardman Boys, on our turf.'" [*Bynum*, 496 Mich at 631.]

This testimony was objectionable, the Supreme Court reasoned, because "[i]n contrast to his otherwise admissible general testimony about aspects of gang culture, Sutherland's testimony interpreting the video evidence specifically connected those character traits to Bynum's conduct in a particular circumstance." *Id*.[4] As noted earlier in the *Bynum* analysis, "an expert may not testify that, on a particular occasion, a gang member acted in conformity with character traits commonly associated with gang members. Such testimony would attempt to prove a defendant's conduct simply because he or she is a gang member." *Id*. at 627.

Applying this rule in *Bynum*, the Supreme Court concluded that Sutherland properly testified that "a gang, in general, protects its turf through violence as an explanation for why a gang member might be willing to commit apparent random acts of violence against people the gang member believes pose a threat to that turf." *Id*. at 630. But Sutherland "veered into objectionable territory when he opined that Bynum had acted in conformity with his gang

---

[4] The Supreme Court did not specifically identify any other aspects of Sutherland's testimony as objectionable.

membership with regard to the specific crimes in question." *Id*. at 630-631. Evidence that Bynum had gone to the party store "'waiting for someone to give [the gang members] the chance' to protect their turf" impermissibly suggested that on a particular occasion, the defendant acted in conformity with general gang-member character traits, and thereby violated MRE 404(a). *Bynum*, 496 Mich at 631.

The prosecutor in this case concedes that Sutherland three times crossed the *Bynum* line by testifying that: (1) defendant, Gordon, and Bolden "purposely" entered enemy territory to "avenge some sort of gang disrespect they felt was done . . . ," (2) defendant, Gordon, and Bolden drove "into this hornet's nest . . . purposely as gang members attempting to avenge disrespect," and (3) defendant and the other two men "were just intending to shoot at that entire neighborhood that was full of rival gang members to prove a point." We agree that at these points, Sutherland's testimony contravened MRE 404(a). Were these Sutherland's only entries into prohibited evidentiary territory, we might be inclined to agree with the prosecutor's argument that this testimony constituted only "a minor blip in the context of the great weight of his time on the witness stand." The record instead reflects that Sutherland's pronouncements of defendant's guilt permeated his expert presentation.

Sutherland not only impermissibly crossed the MRE 404(a) line by connecting general character with specific conduct, he repeatedly told the jury that the facts demonstrated defendant's guilt of the crimes with which he stood charged. This was a bridge too far. While expert testimony regarding gangs and their culture was relevant in this case, MRE 702 does not allow an expert testifying in a criminal trial to offer his or her learned opinion regarding the ultimate question of a defendant's guilt or innocence.

Expert testimony that "'merely deals with a proposition that is not beyond the ken of common knowledge'" is inadmissible. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 790; 685 NW2d 391 (2004), quoting *Zuzula v ABB Power T & D Co Inc*, 267 F Supp 2d 703, 711 (ED Mich, 2003). A defendant's guilt or innocence falls squarely within the common-knowledge realm. It is a well-established rule of law that "[a] witness may not opine about the defendant's guilt or innocence in criminal case." *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012). "Such testimony is unfairly prejudicial because it invades" the jury's exclusive province. *State v Demery*, 144 Wn2d 753, 759; 30 P3d 1278 (2001) (quotation marks and citations omitted).

In an analogous context – expert witness testimony involving drug trafficking—this Court has recognized the danger that arises when the profile of a drug transaction "begins to resemble the defendant's circumstances and characteristics too closely," thereby approximating "substantive evidence of guilt." *People v Murray*, 234 Mich App 46, 55; 593 NW2d 690 (1999). Because expert testimony carries "an aura of special reliability and trustworthiness," its admission risks "that the jury will confuse the expert's description of the profile for substantive evidence of a defendant's guilt." *Id.* at 55-56 (quotation marks and citation omitted). "Particularly when the opinion is proffered by an officer of the law, the error seriously affects the fairness, integrity, or public reputation of the proceedings." *Bynum*, 496 Mich at 633.

To avoid this danger, trial courts "must take into consideration the particular circumstances of a case and enable profile testimony that aids the jury in intelligently

-12-

understanding the evidentiary backdrop of the case, and the modus operandi of drug dealers, but stop short of enabling profile testimony that purports to comment directly or substantively on a defendant's guilt." *Murray*, 234 Mich App at 56. In *Murray*, this Court offered suggestions for distinguishing between proper and improper uses of drug profile testimony, including an instruction that "the expert witness should not express his opinion, based on a profile, that the defendant is guilty, nor should he expressly compare the defendant's characteristics to the profile in such a way that guilt is necessarily implied." *Id*. at 57.[5]

Sutherland moved from general, hypothetical facts about gangs into informing the jury that defendant was a known gang criminal. He described that Battle Creek police records disclosed the names of "the same group of younger individuals" who were "consistently . . . committing violent crime." The crimes involved were not mere truancy, Sutherland highlighted, but "shooting at people, beating people up, robbing them, breaking into houses, stealing cars." Defendant was among this group, Sutherland asserted. Defendant and others, Sutherland maintained, "continued to associate together while these crimes were happening."[6] This testimony had nothing to do with general gang characteristics or habits. Rather, Sutherland labeled defendant an aider and abettor of uncharged (and utterly unproven) violent acts perpetrated by known "one Hundred block guys associating with each other while committing violent crime[.]" Sutherland's expert conclusion that defendant was a gang member also served to insure defendant's conviction under MCL 750.411u, which otherwise requires the prosecution to prove gang membership or association beyond a reasonable doubt.

Sutherland then segued into a discussion of the gang's "bullseye command structure," initially identifying defendant as "in between the associate and hardcore member because [of] his willingness to be in a car that's involved in a shooting[.]" A "hardcore" member, Sutherland tutored, "won't hesitate to pull the trigger to shoot somebody." After Anderson's murder, Sutherland declared, "I would classify him and the other officers in the Gang Unit would classify him as a hardcore member due to his escalation and now this incident." With this testimony, Sutherland again departed from the proper role of an expert as an instructor on gang culture,

---

[5] Similarly, expert testimony regarding the battered woman syndrome, while generally admissible, may not include an opinion "that complainant was a battered woman, . . . that defendant was a batterer or that he is guilty of the crime[.]" *People v Christel*, 449 Mich 578, 591; 537 NW2d 194 (1995).

[6] MRE 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence. This rule does not restrict the discretion of the court to receive expert opinion testimony subject to the condition that the factual bases of the opinion be admitted in evidence thereafter." The police reports on which Sutherland relied to conclude that defendant was a gang member were not admitted in evidence. We doubt that these reports could pass evidentiary muster, given that Sutherland's testimony suggests that only hearsay linked defendant to gang crimes.

-13-

instead transforming himself as an expert on defendant's guilt.[7] "Police witnesses have a special obligation not to venture into such forbidden areas." *People v Holly*, 129 Mich App 405, 415-416, 341 NW2d 823 (1983).

Sutherland's interpretation of the evidence as consistent with defendant's guilt extended throughout the balance of his testimony. First, Sutherland connected the general gang attribute of avenging disrespect specifically to defendant, explaining that this characteristic of gang thought supplied the motive for defendant's participation in the shooting:

> It gave [defendant] great motive to avenge this disrespect and retaliate with violence to show not only don't mess with my M.O.B. One Hundred Block, but don't mess with me because I'm a very violent hardcore member of this gang, and if you mess with me this is what's going to happen. So he had very strong motive to retaliate as well as the other members in that car that night.[8]

Sutherland again linked defendant's conduct to general gang behavior in discussing the means to commit the shooting, stating that M.O.B. provided "the pool of guns," the transportation, and the allies necessary for defendant to "be on rival turf." And rather than speaking in general terms about the opportunity to commit crime afforded by gang membership and mores, Sutherland closed the circle by explicitly expressing an opinion as to defendant's guilt:

> If Kaleb's not in the gang, he's not there to begin with. He's not in the car. He doesn't have guns in his trunk. He doesn't go to the trunk and get the guns. They don't drive down into the hornet nest of rival gang members and keep shooting. . . . But because Kaleb's in a gang, Darellee's in a gang, Romell's in a gang that gives them the opportunity to following through with their plan now to show not only are they in a gang, they're hardcore members of this gang, and basically respect, respect our gang. You disrespected us now it's time to avenge this disrespect.

In response to the prosecutor's question of whether the shooting of Anderson was gang related, Sutherland reiterated his belief in defendant's *personal* involvement and guilt, expressing that defendant, Bolden and Gordon "purposely" drove into "Northside turf" because they were "looking for trouble." He continued:

---

[7] The Supreme Court declined to reach this exact issue in *Bynum*, 496 Mich at 635 n 43, instead leaving it to the trial court to rule on the admissibility of such evidence.

[8] We underscore the critical difference between *general* testimony about *gang* motivations to avenge disrespect and testimony connecting those aspects of gang character to defendant's action at a specific time. The Supreme Court condemned the latter in *Bynum*: "Such testimony attempted to 'prov[e] action in conformity' with character traits common to all gang members on a particular occasion. As a result, this testimony violated MRE 404(a)." *Bynum*, 496 Mich at 631.

They're purposely looking for trouble. They're purposely looking to avenge some type of gang disrespect they felt was done whether at Burger King earlier or once the bottle was thrown at them. . . .

[S]o for Kaleb, Darellee, and Romell to get into the car and now drive into this hornets['] nest, they are purposely as gang members attempting to avenge disrespect. . . . They were just intending to shoot at that entire neighborhood that was full of rival gang members to prove a point. They didn't care who they hit, but they were there to care to prove a point of we should be feared and respected.

Sutherland's testimony interpreting the events of the fatal evening culminated with yet another opinion connecting general gang characteristics specifically to defendant's actions and simultaneously pronouncing his guilt:

But a lot of times this incident is a perfect example of Kaleb, and Darellee, and Romell didn't know who specifically they should be mad at, but they knew they should be mad at all of the rival Northside gang members that were up there including Park Hill. So they're just going to shoot out all sides of the car whoever they hit, they hit but they prove their point by showing that they very violent.

*Q.* And ultimately Ledell Anderson being shot and killed?

*A.* Yes.

A fundamental premise of our system of criminal justice is that the *jury* decides guilt or innocence. Experts are not permitted to opine on this subject for two reasons. First, such opinions are unnecessary under MRE 702, because the ultimate resolution of the guilt or innocence questions resides solely with a jury. Second, a police officer's opinion of guilt is profoundly prejudicial, and therefore inadmissible under MRE 403. A police officer/gang expert wears a mantle of authority bestowed by the judge. The expert's opinions necessarily carry an aura of special authority. His or her assertions of a defendant's guilt, especially when repeated over and over again, are likely to leave a powerful and lasting impression.

Because defendant's counsel failed to object to Sutherland's inadmissible testimony on the ground of MRE 403 or MRE 702, we must consider whether reversal is warranted under the plain error standard of review. An appellate court may reverse under the plain error doctrine only when an obvious error has occurred, and the plain error "resulted in the conviction of an actually innocent defendant or . . . 'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings' independent of the defendant's innocence." *Carines*, 460 Mich at 763.

The prosecution's introduction of Sutherland's opinion that defendant committed Ledell's murder constituted plain error. The Supreme Court in *Bynum* found strikingly similar testimony plainly erroneous. Based on the same reasoning, the admission of evidence connecting defendant's conduct on the night of the shooting to his gang membership "exceeded the limitations of MRE 404(a)[.]" *Bynum*, 496 Mich at 632. Here, Sutherland compounded the MRE 404(a) violations by repetitively declaring that based on his expert knowledge of gang

-15-

mentality and mechanics, defendant was guilty of the charged offenses. The introduction of this evidence, too, was obvious error.

The prosecution contends that because defendant has not shown that he is actually innocent of second-degree murder, we need not reverse. We cannot accept this argument, given that the evidence of defendant's guilt was far from overwhelming and the jury deadlocked on four of the eight charges. Moreover, the error committed here in allowing Sutherland to repeatedly opine as to defendant's guilt satisfies the second prong of the *Carines* plain-error formulation, in that the admission of this evidence seriously affected the fairness, integrity, and public reputation of the proceedings.

Sutherland's inadmissible testimony tainted the verdict. In allowing Sutherland to express an expert opinion regarding the ultimate issue in the case and most every element of the charged offenses, the trial court abrogated its gatekeeping role under MRE 702. The court's limiting instruction informed the jury that it could not use the inadmissible evidence to conclude that "defendant is a bad person, or that he is likely to commit crimes" or that "he may have been guilty of *other* bad conduct at other times not involved in these particular allegations." (Emphasis added.) At no time did the court admonish the jury that it could not consider Sutherland's opinions as substantive evidence of defendant's guilt *in this case*. Nor could such an instruction have erased the impact of Sutherland's opinions. The improper admission of Sutherland's oft-repeated opinion as to defendant's guilt impeded the jury's ability to function as an independent fact-finder, seriously affecting the fairness and the integrity of the trial.[9]

We reverse and remand for a new trial. We do not retain jurisdiction.

/s/ E. Thomas Fitzgerald
/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause

---

[9] As much of Sutherland's testimony was inadmissible on MRE 404(a) and relevancy grounds, we need not consider defendant's other challenges to the inclusion of this evidence.