# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MICHAEL DWAYNE CARVER,

Defendant-Appellant.

UNPUBLISHED
August 29, 2017

No. 328157
Kalamazoo Circuit Court
LC No. 2014-000448-FC

Before: GADOLA, P.J., TALBOT, C.J., and GLEICHER, J.

PER CURIAM.

Defendant, Michael Dwayne Carver, appeals as of right his jury-trial conviction of first-degree criminal sexual conduct, MCL 750.520b(1)(a) and (2)(b). The trial court imposed a sentence of 25 to 50 years in prison for the conviction. Defendant filed an appeal as of right in this Court. While his case was pending on appeal, defendant filed a motion to remand, which this Court granted.[1] On remand, the trial court granted defendant's motion for a new trial on the basis that his trial counsel provided ineffective assistance. On appeal, the prosecution argues that the trial court abused its discretion when it granted defendant's motion. Defendant also argues on appeal that he is entitled to a new trial on additional grounds not addressed by the trial court. For the reasons provided in this opinion, we affirm the trial court's order, vacate defendant's conviction and sentence, and remand the case for a new trial.

## I. BASIC FACTS

At trial, the victim's mother testified that she was in the process of bathing the then five-year-old victim when she noticed a small speck of blood on the tissue she used to wipe the victim. The victim's mother then questioned the victim about whether someone had touched her inappropriately. Testimony established that the victim initially told her mother that her three-year-old brother touched her, but, after her mother expressed disbelief, the victim identified defendant as the person who inappropriately touched her. Testimony established that defendant was the uncle of the victim's mother and that he lived in the basement of the victim's home at

---

[1] *People v Carver*, unpublished order of the Court of Appeals, entered April 25, 2016 (Docket No. 328157).

the time in question. The victim testified that she went down to defendant's bedroom during the night, and he put his finger inside her and wiggled it around. Defendant testified and denied that he touched the victim inappropriately.

At trial, defendant's defense counsel, Becket Jones, highlighted the inconsistencies between the statements that the victim gave to various persons. In order to place some of these inconsistencies before the jury, Jones called the social worker who performed the victim's forensic examination, Ruth Westfall. Westfall testified about the victim's statements and agreed that the protocols for forensic interviews were designed to limit false positives. She testified that false positives could occur, but that they are "very rare." Defense counsel also called Detective Jennifer Higby, the lead detective in the case, who watched Westfall interview the victim via closed-circuit television and testified regarding the version of events the victim relayed to Westfall during the interview. Higby told the jury that "[d]uring my investigation and according to my training, I was comfortable that a sexual assault had taken place."

In closing, Jones argued that the victim likely felt cajoled into naming someone when she was confronted by her mother. Given the inconsistencies and the possibility that the victim only named someone to satisfy her mother, defense counsel asked the jury to find that the prosecution had not proved its case beyond a reasonable doubt. The jury, however, believed the victim's testimony, disbelieved defendant's denial, and found him guilty.

On appeal in this Court, defendant moved to remand so the trial court could hold an evidentiary hearing on whether Jones provided ineffective assistance. Defendant maintained that Jones should have consulted with and called an expert on child suggestibility, relying on an affidavit by an expert in forensic psychology, Dr. Daniel Swerdlow-Freed. This Court determined that defendant established grounds to warrant an evidentiary hearing on this limited issue and granted the motion. See *People v Carver*, unpublished order of the Court of Appeals, entered April 25, 2016 (Docket No. 328157).[2]

The trial court held the evidentiary hearing in July 2016. At the hearing, Swerdlow-Freed testified that child suggestibility refers to the phenomenon in which a statement is made to a child that is not consistent with something that the child has already reported, but the child accepts the change suggested by the statement. Swerdlow-Freed explained that young children—preschool-aged children—are the "most suggestible." As children mature into latency and adolescence, he explained, their propensity "for suggestibility or their vulnerability for suggestibility gradually diminishes and becomes more . . . what we see in adults." Swerdlow-Freed testified that age was the main factor, but other factors include whether the child was interviewed by someone with a bias, whether the child was questioned improperly, or whether the child felt pressured, coerced, or threatened to say something.

---

[2] Defendant also filed a motion to remand on his own behalf to explore numerous other instances of alleged ineffective assistance. However, this Court denied his motion for failure to persuade that further factual development of the record was necessary. See *People v Carver*, unpublished order of the Court of Appeals, entered July 8, 2016 (Docket No. 328157).

Swerdlow-Freed also described the concept of source monitoring, which he stated deals with whether a person can accurately distinguish between information that he or she knows because he or she experienced it and information that he or she knows because he or she heard it. According to Swerdlow-Freed, by the ages of 8 to 10, children have well-developed source monitoring abilities. But, he explained, children in the 3-to-5 year range are still developing the ability. Swerdlow-Freed testified that very young children have difficulty distinguishing between things that they have experienced and things that they have merely heard about. "So, they can just incorporate things that they've heard about and come to believe that they've experience[d] it." He explained that a false memory is a memory of something that did not occur or that occurred in a way other than described. Children with false memories will often come to believe them to be true. Swerdlow-Freed cited as an example a study involving children who observed an event and described it immediately afterward. Sometime later they were read a story about the event that included false details. When asked to describe the event again, approximately 43% of the children incorporated the false details into their new report.

Swerdlow-Freed stated that a child who has incorporated a false memory will often provide striking details for the memory, a phenomenon referred to as contextual imbedding. He cited a study in which children were falsely led to believe that they had had their finger caught in a mousetrap. A number of children ended up reporting that they had in fact had their fingers caught in mousetraps. One child even gave an elaborate account of how his finger came to be caught in the trap. Swerdlow-Freed explained, "[I]f there's a reason to believe or evidence that what [the child is] reporting may include misinformation, and it may be based on a false memory, [the child's] report may be very consistent, but very inaccurate." For that reason, Swerdlow-Freed opined, one cannot say that a report is more reliable because the child provided details. He explained that in a study of 109 mental health and legal professionals who observed the final interviews of 10 children who reported on events—five falsely and five accurately—the professionals correctly differentiated between the truthful and the inaccurate accounts only half the time. This study reflects that even professionals had only a 50/50 chance of identifying a truthful account.

Swerdlow-Freed noted that the forensic interview protocol was designed to reduce the impact of suggestibility. Interviewers who follow the forensic interview protocol ask open-ended questions that do not include information about an event ahead of time. The answers to such questions, he stated, tend to be the most reliable and accurate. However, he explained, that assumes that the child has not already been exposed to misleading information. Unfortunately, interviewers may introduce information to the child during the opening stages of the interview by using, for example, "option/posing questions," which are questions that require a yes or no answer or that provide multiple choices.

Swerdlow-Freed told the court about problems that may occur when an untrained person questions a child. He explained that untrained persons may repeatedly ask the same question or may use advanced language that confuses the child. He said that a child may get the sense that his or her answer was "wrong" when asked the same question multiple times and may change the answer. Similarly, he explained, children are raised to be cooperative and conversational and will often attempt to answer a question even if they do not know the answer.

Turning to the facts of this case, Swerdlow-Freed recalled that the victim's initial report occurred during bathing or toileting after the child's mother saw a speck of blood on tissue. The mother rejected the child's first explanation and proceeded to question her about inappropriate touching. The questioning suggested an answer: that someone touched her inappropriately. The fact that the mother rejected the child's first answer was also problematic because that was an indication of bias. There was also evidence that the mother might have told the child that she would be in trouble if she did not answer. Swerdlow-Freed stated that the rejection of the child's first answer, the repeated questioning, and the pressure to answer were all concerns.

There was also evidence that the doctor at the emergency room questioned the victim and that the victim was exposed to further questioning by adults after she returned home from the hospital. There was no way to say for certain what information the child "was exposed to" when the adults were talking to each other and whether she subsequently incorporated that information into her memory. Swerdlow-Freed also expressed concern about the evidence that the victim's mother had routinely asked her children about inappropriate touching before the events at issue. He explained that, when a parent is unusually concerned or vigilant about such things, it heightens the child's awareness that the child could be touched inappropriately. It also has the potential to give the child age-inappropriate information.

In addition to the concerns with the circumstances surrounding the initial disclosure and the victim's possible exposure to suggested facts, Swerdlow-Freed stated that his review of the transcripts caused him concern that the victim was in fact susceptible to suggestion. He cited examples in which the victim reported that she did not remember an event and then, after the prosecutor repeatedly questioned her and provided suggested details, she changed her testimony. There was also evidence that she was willing to answer a question to which she clearly did not know the answer. Swerdlow-Freed testified that the victim's forensic interview was adequately conducted, but he opined that there was evidence that the victim's memory might have been tainted before the interview.

Swerdlow-Freed was particularly struck by the differences between the mother's report of the child's statements to child protective services and the statements the victim made during the forensic interview. Her account of the victim's statements about the central details was so different from the victim's statements about the central details at the forensic interview that it raised red flags. He testified as follows:

What the research shows is that children tend to be very accurate and consistent about the central details. But, here there's a discrepancy between what [the victim] is reporting and what her mother is saying [the victim] told her. So, either mom is not accurately reporting, which is certainly one hypothesis. And, if she's not accurately reporting about this, you know, you have to wonder about what happened. Or she is accurately reporting and something has happened in [the victim's] memory that she's reporting very different events.

Now, there's other—there's other feature[s] of their report that are the same, and, I want to acknowledge that. But, again, in a situation like you have here where there was pre-interview, you know, discussions and pressure and

-4-

repeated questioning, and you get these kinds of contradictions. That's—that's when the whole picture raises a flag.

If you take out some of these elements, the picture may be different and there may not be red flags. But, what I'm saying in this particular instance, you know, there's some red flags that have arisen.

Swerdlow-Freed opined that there were also problems with the testimony by professionals at trial. He specifically found fault with the testimony of Higby and Westfall. According to Swerdlow-Freed, Higby's statement that she was comfortable that an assault occurred was nothing more than an opinion that the victim was telling the truth and, as already stated, a study showed that professionals have no better than a 50/50 chance of correctly judging whether a child is accurately relating an event. Likewise, Swerdlow-Freed had seen no research suggesting that Westfall was accurate when she stated that false positives are very rare.

Swerdlow-Freed stated that a child may not be lying when the child relates a false event. To lie, the child must typically be aware that he or she is not being truthful. Because the child believes the memory even though it is false, he informed the court, the child believes that he or she is accurately describing events. As such, whether the child has a motive to lie was not necessarily related to whether the child's memory was false. Similarly, the fact that an adult does not have a motive to taint a child's memory does not mean that the adult did not inadvertently taint the child's memory.

Jones testified at the hearing that he knew the case was going to be a credibility contest. He explained that his strategy was to highlight the discrepancies between the victim's various statements and to emphasize that children can lie. He explained that he consulted with two lawyers at his firm and he knew about Swerdlow-Freed because one of the partners at his firm had used him in the past as a consultant on child suggestibility. Jones said he chose not to consult an expert, however, because he wanted a "straight line in terms of what I want to present," and the facts, he felt, were favorable. He denied that he did not pursue an expert because defendant did not have the funds to pay for one.

Jones testified that he researched the protocols for forensic interviews, but he did not recall doing any research on how the circumstances of an initial disclosure might impact the reliability of the disclosure. He believed that repeated questioning of a child could taint the child's memory. He also recalled reviewing one study that his partner utilized in another case on child suggestibility, but he did not recall what it stated. Jones could not state the distinction between a child lying and a child relating a false memory. Indeed, he said he did not use the "term false memories" with the jury because that would be a term from an expert and he relied on the discrepancies between the victim's various statements to support his defense theory.

Nevertheless, he believed that he covered in his closing argument the fact that he did not know whether the victim believed that what she was relaying was true.[3]

Jones agreed that he called Westfall as a witness, but he stated that he did so "first and foremost" because defendant demanded it and "it was not a polite demand." He thought it was important to have Westfall testify after the victim testified that she did not recall the forensic interview—even after she watched the video of it—because he needed to use Westfall to highlight the discrepancies between the victim's various statements. Jones said he was apprehensive about asking experts about numbers because his firm had experienced experts who testified that children tell the truth 95% of the time. He agreed that he was under the impression from "other transcripts" that unreliable reports by children were rare, but he questioned the science. Jones also agreed that he called Higby and that she testified that she was comfortable that a sexual assault had taken place. He conceded that he was unaware of any studies showing that trained professionals have only a 50/50 chance of correctly identifying when a child's statements are accurate.

In November 2016, the trial court entered its opinion and order. The trial court expressed concern about Jones's failure to consult with an expert relevant to his defense. The court found that Jones lacked a basic knowledge in the field of "child memory, suggestibility, taint, and false memories." He reviewed the forensic interview protocols and transcripts from other cases but "had no specific knowledge on [the] concepts of source monitoring, false memories, contextual embedding," and he was unaware of the various studies explaining those phenomena. He also knew about only one risk factor for an unreliable report—repeated questioning—which was not even the main risk factor in this case. The trial court opined that Jones's failure to educate the jury about these concepts was a direct result of Jones's "unreasonable decision not to sufficiently educate himself in this specialized field[.]" In the trial court's opinion, this lack of knowledge made it impossible for Jones to make an informed decision regarding whether an expert was necessary for the defense and made it impossible for him to effectively examine Higby and Westfall. The court concluded that Jones's failure to properly investigate these topics fell below an objective standard of reasonableness under prevailing professional norms and prejudiced defendant's trial. Accordingly, the trial court granted defendant's motion for a new trial.

The prosecution appealed the trial court's decision to grant defendant's motion for a new trial in this Court. Under a separate docket, this Court denied leave to appeal, but indicated that the denial was without prejudice "to the prosecutor filing a supplemental brief" in this docket. See *People v Carver*, unpublished order of the Court of Appeals, entered January 27, 2017 (Docket No. 336307). The prosecution then filed a supplemental brief in this docket, arguing that the trial court erred when it granted defendant's motion for a new trial.

---

[3] In his closing, Jones briefly mentioned "memory issues" and whether the victim only changed her story as the result of repeated questioning and prodding, but he relied on the prosecutor's assertion of that point and the jury's common sense understanding that that may happen.

## II. MOTION FOR A NEW TRIAL

### A. STANDARDS OF REVIEW

We review a trial court's decision to grant a new trial for an abuse of discretion. *People v Grissom*, 492 Mich 296, 312; 821 NW2d 50 (2012). A trial court abuses its discretion when it selects an outcome that is outside the range of reasonable and principled outcomes. *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008). Whether a defendant's trial counsel provided ineffective assistance is a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review a trial court's factual findings for clear error. *People v Gioglio (On Remand)*, 296 Mich App 12, 20; 815 NW2d 589, remanded for resentencing 493 Mich 864 (2012). A finding is clearly erroneous if we are left with the definite and firm conviction that the trial court made a mistake. *Id.* at 20-21. We review de novo the legal question of whether an attorney's acts or omissions fell below an objective standard of reasonableness and prejudiced a defendant's trial. *Id.* at 19-20.

### B. INEFFECTIVE ASSISTANCE OF COUNSEL

"To establish a claim of ineffective assistance of counsel, the defendant must show that 'counsel's representation fell below an objective standard of reasonableness' under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Gioglio*, 296 Mich App at 22, quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 St Ct 2052; 80 L Ed 2d 674 (1984). In his motion for a new trial, defendant argued that Jones's failure to investigate and learn more about the science of child memory and suggestibility fell below an objective standard of reasonableness under prevailing professional norms.

Jones testified at the evidentiary hearing that he knew this case would be a credibility contest between the then six-year-old victim and defendant. He nevertheless chose not to consult an expert on forensic psychology or child memory and suggestibility because, he said, he preferred to use a more "straight line" defense; that is, he preferred to highlight the discrepancies between the victim's various statements and emphasize that children can lie.

Jones could, as a matter of trial strategy, choose to pursue a defense directed solely at highlighting the discrepancies between the victim's various statements about the incidents. See generally *People v Pickens*, 446 Mich 298, 325; 521 NW2d 797 (1994). However, whether that decision was reasonable depends on whether his strategic choice was " 'made after less than complete investigation,' " because "any choice is 'reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012), quoting *Strickland*, 466 US at 690-691. A trial strategy is sound if defense counsel develops the strategy in concert with an investigation that is adequately supported by reasonable professional judgment in light of the facts, circumstances, pleadings, and law attending the case. *People v Grant*, 470 Mich 477, 486-487; 684 NW2d 686 (2004) (opinion by KELLY, J.).

Jones testified that he prepared for this case by consulting with two lawyers from his firm. He admitted that he was generally aware of the phenomenon of child suggestibility

through a study utilized by his partner in a different case. He also reviewed the protocols applicable to forensic interviews, which, as he elicited at trial, were intended to prevent "false positives." As such, he was well aware that there was scientific support for the contention that children are susceptible to suggestion and may give "false positives." Nevertheless, he could not state the distinction between a child lying and a child relating a false memory, and only knew one factor that implicated suggestibility—repeated questioning. He further recognized the need for an expert to explain these phenomena; he stated, for example, that he did not use the "term false memories" at trial because that term would have to be defined by an expert and he chose to rely on highlighting the discrepancies between the victim's various statements. Jones also reviewed transcripts of expert testimony from other trials and was aware that some experts opine that children accurately report sexual abuse 95% of the time; he stated that he doubted the science behind those opinions, but he identified no basis for his doubt.

Jones chose to present a defense that centered on highlighting the differences between the victim's statements, as reported by different persons. Because the differences did not suggest that the victim was mistaken about the abuse—the statements all included a sexual assault, the surrounding details were simply different—Jones's preferred defense left him in a position where he had to argue to the jury that the victim was lying about the assault. Yet, there was no evidence from any witness tending to suggest that the child had a motive to lie, that her mother held a grudge against defendant, or that the victim was otherwise coached to make a false accusation. Rather, the facts tended to suggest that the victim spontaneously revealed to her mother an incident of sexual abuse by a beloved family member.

Given the evidence of an apparently genuine revelation of abuse and the absence of evidence of motive to lie, it was highly unlikely that the jury would find that the victim spontaneously and falsely accused defendant of sexual assault. The jury even asked the trial court to pose various questions at trial that demonstrated that it was struggling with this issue. The trial court asked the victim's mother on behalf of the jury whether she was "in any way at odds" with defendant or if she had "any disagreements that were kind of broiling at that particular point?" She responded that if she had, "[h]e wouldn't have been living in my house . . . ." The jury also had the court ask her if the victim "had ever lied on Mr. Carver" before the incident at issue. She stated that the victim had not. The jury's questions implied concern that, in the absence of evidence tending to suggest a motive to lie, a child would not normally make such an accusation.

Jones's testimony at the evidentiary hearing showed that he had enough knowledge about the issue of child suggestibility to know that there was a potential defense that did not rely on arguing to the jury that the victim was a liar. Had he consulted with an expert on this issue, such as Swerdlow-Freed, he would have obtained a solid grasp of the concept of suggestibility and its risk factors, he would have learned about the phenomena of source monitoring and contextual embedding, and he would have had better understanding of the difference between a false memory and an outright lie. Given that Jones was aware of Swerdlow-Freed at the time of trial and that his law firm had used him as an expert in other cases, it is virtually certain that, had a consultation occurred, Jones would have found an expert (likely Swerdlow-Freed) who could provide him with the tools he needed to rebut testimony by an expert or an investigator suggesting that it is a rare case in which a child makes a false report. Further, considering Swerdlow-Freed's testimony at the evidentiary hearing, had Jones consulted with an expert and

educated himself about the psychological and developmental issues at play, it is also likely that he would have understood that it would be helpful to the defense to have an expert who could explain these matters to the jury and identify the risk factors that were present in this case. With such testimony, the jury would have been in a better position to evaluate the evidence and determine whether the sexual assault occurred or occurred in the manner described by the victim.

Jones's failure to consult with an investigator despite having knowledge of these issues is analogous to defense counsel's failure to investigate in *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015). In that case, the defendant's lawyer consulted with an expert who told him that he did not agree with his defense theory and suggested that he speak with a specific expert who was both highly qualified and would likely be able to support the defense theory. *Id.* at 385-386. Despite this advice, the defendant's lawyer failed to consult any other experts and did not call any expert in support of the defense theory at trial. *Id.* at 384-387. Our Supreme Court determined that defense counsel's knowledge of the existence of an expert who could possibly support the defense theory rendered his decision to confine his pursuit of expert assistance only to one expert with an opposing viewpoint unreasonable because it left the defense theory without objective, expert testimonial support. *Id.* at 392. The Court similarly concluded that defense counsel's failure to educate himself on the medical issues that were central to the case prevented him from making an informed choice regarding his pursuit of expert assistance and left him insufficiently equipped to challenge the prosecution's experts. *Id.*

In this case, Jones knew that the prosecution's case depended on the credibility and accuracy of the child victim's testimony. He performed a limited investigation and learned about the issue of child suggestibility, which was highly relevant to the accuracy of the victim's reports. He was even aware of a potential expert who could offer testimony tending to suggest that children of the victim's age are highly susceptible to suggestibility and that suggested answers might result in the creation of false memories. He thus could have presented expert testimony explaining how the child victim might honestly—but falsely—believe that defendant sexually assaulted her. Yet he did not further educate himself about the issue of suggestibility and chose not to consult with the expert. As was the case in *Ackley*, Jones's failure to investigate left him with an inadequate and objectively unsupported defense theory and rendered him ill-equipped to examine the professional witnesses he called at trial. *Id.* at 392. Jones's decision to forego further investigation into the issues that were central to the case, particularly given his limited knowledge and his firm's previous experience with Swerdlow-Freed, fell below an objective standard of reasonableness under prevailing professional norms.

Our conclusion is further supported by the Supreme Court's decision in *Trakhtenberg*, 493 Mich 38. In *Trakhtenberg*, an eight-year-old complainant alleged that the defendant, her father, inappropriately touched her on three or four occasions and once forced her to touch his genitals. *Id.* at 43. The defendant was convicted of three counts of criminal sexual conduct as a result of the allegations. *Id.* Following trial, the defendant alleged that his defense counsel provided ineffective assistance. *Id.* at 44. At an evidentiary hearing, it was revealed for the first time that the complainant's mother brought the child to a youth pastor and an organization that provided treatment services for child victims of abuse for a forensic interview before reporting the allegations of abuse to the authorities. *Id.* at 45-46. It was further revealed that the responding detective asked the mother "to directly ask the complainant whether defendant had ever touched her 'private parts' with his fingers." *Id.* at 46.

At the hearing, the employee who performed the forensic interview testified that she was unaware that the child had spoken to others about the abuse and that it was "important to know whether the child has spoken to anyone else in order to conduct a proper forensic interview because, as a result of repeated interviewing, a child might start to mistakenly believe that something happened to him or her." *Id.* An expert in clinical psychology also testified that she had "concern regarding the complainant's knowledge of her mother's hatred of defendant" and explained that the mother's "leading and suggestive questions and the repeated questioning of the complainant . . . could have tainted the child's recollection of the events surrounding the alleged abuse." *Id.* Following the hearing, the trial court ruled that defense counsel was ineffective and that the defendant was entitled to a new trial. *Id.* at 47.

On appeal, our Supreme Court held that defense counsel "failed to exercise reasonable professional judgment when deciding to forgo particular investigations relevant to the defense[.]" *Id.* at 52. The Court noted that, "given the exposure the complainant had to multiple interviews and leading questions, a reasonable attorney would have consulted an expert . . . to testify regarding the propriety of how the complainant made her allegations," yet defense counsel "chose not to consult any witnesses or obtain additional evidence before she decided to pursue a defense strategy for which she concluded that no further investigation was necessary." *Id.* at 54.

Similar to the young complainant in *Trakhtenberg*, testimony reveals that the five-year-old victim in this case made her allegation of abuse after her mother rejected her first explanation and proceeded to pressure and question the child in a suggestive manner. The evidence further reveals that the victim was exposed to additional questioning at the emergency room and by adults after she returned home, and may have been privy to age-inappropriate information because her mother routinely asked her children about inappropriate touching before the incident in question. A reasonable attorney under the circumstances would have understood the need to consult an expert regarding the propriety of how the victim made her allegations. Yet Jones decided to pursue a defense strategy for which he concluded that no further investigation was necessary before consulting such an expert or educating himself on the concept of child suggestibility and its associated risk factors. This decision amounted to a failure to exercise reasonable professional judgment. See *Trakhtenberg*, 493 Mich at 53-54.

On appeal, the prosecution argues that the trial court erred when it determined that Jones's investigation was inadequate on various grounds. It argues that the trial court clearly erred when it accepted Swerdlow-Freed's testimony that the victim's memory must have been exposed to taint. The trial court, however, did not find that the victim's testimony was in fact tainted. It stated that Jones's failure to investigate left the jury uninformed about the possibility that the victim's statements could have been "the result of taint and suggestibility. . . ." As such, the jury was not in a position to "fairly evaluate the evidence" and did not know that it was at least "possible" that the victim "reported events that did not actually happen[.]"

The prosecutor also complains that the trial court apparently credited Swerdlow-Freed's "unsubstantiated belief" that false reports are not rare, even though, it states, there are studies to the contrary. Swerdlow-Freed did not testify that false reports are common; he testified extensively about the problem of suggestibility and related phenomena and the risk factors implicating false memories. He then opined that it was possible for a child to have a false memory of an event and, as a result, believably report the false memory. He also testified that

studies show that a significant percentage of children exposed to taint will incorporate false details into their reports. He nevertheless related that children tend to reliably report the core details when not exposed to taint. He also noted studies that showed that, even when exposed to taint, only a portion of the children studied incorporated false details, which amounted to an implicit recognition that a significant percentage of children will accurately report an event even after being exposed to possible taint. As the trial court correctly noted, Swerdlow-Freed's testimony, if it had been presented to the jury, would have provided the jury with the context for properly evaluating the child victim's statements. Without that context, however, the jury could not reject the accuracy of the victim's report unless it essentially found that she was lying. Given the facts of this case, such a finding was highly unlikely.

The prosecution also argues that the trial court's jury instruction on witness credibility, which was consistent with M Crim JI 3.6, adequately informed the jury that it could evaluate the victim's age and maturity when considering her testimony. That instruction did not address the problem of child suggestibility and false memories and could not serve as a substitute for expert testimony on these matters because the phenomena are plainly beyond the ken of common knowledge. See MRE 702; *People v Bynum*, 496 Mich 610, 626; 852 NW2d 570 (2014) (stating that expert testimony may be necessary when the evidence implicates matters that are beyond the ken of common knowledge). Had the defense called Swerdlow-Freed, he could have offered testimony about these phenomena and the related risk factors. That testimony would have given the jury a better understanding of the problems of credibility peculiar to the very young witness involved in this case and would have explained how she might have believably reported an event that did not happen or that happened in way that was substantially different from what she reported. See, e.g., *People v Christel*, 449 Mich 578, 592-593; 537 NW2d 194 (1995) (recognizing that expert testimony may be necessary to explain behaviors or responses of a victim that might appear incomprehensible to average people and stating that the expert's testimony might help the jury properly evaluate the witness's testimony).

The prosecution suggests that the trial court was mistaken when it opined that credibility was the ultimate issue because there was no physical evidence. It notes that there were phone records that showed that one of the victim's statements—that the incident occurred when her mother was on the phone with her aunt—could not be true; and there was medical testimony that the victim did not have any physical injuries. In context, the trial court was referring to the absence of physical evidence tending to show that defendant did in fact sexually assault the victim—that is, it recognized that the prosecution's case depended on convincing the jury that the victim was accurately reporting the assault. The trial court's characterization of the case was correct, and the prosecution's claim to the contrary is disingenuous.

The prosecution finally argues that, even if Jones's failure to investigate fell below an objective standard of reasonableness under prevailing professional norms, the trial court erred when it determined that the failure prejudiced defendant's trial. In order to warrant a new trial on the basis of ineffective assistance, defendant need only show that there is a "reasonable probability" that the outcome would have been different. *Gioglio*, 296 Mich App at 22. Had Jones properly investigated the issue of child suggestibility and false memories, he would have realized the need for expert testimony on the unique issues involving accusations by very young children. See *Bynum*, 496 Mich at 626; *Christel*, 449 Mich at 592-593. An expert could have explained how a child of the victim's age was susceptible to suggestion and might inadvertently

incorporate false information into her memories. With that testimony, Jones could have plausibly argued that the victim's report of sexual assault was false, even though she might honestly believe it was true, and even though there was no evidence that the adults in the victim's life had a motive to cause her to make a false allegation. With that information before the jury, defendant's theory of the case would not have depended on convincing the jury that the victim lied when she accused him of sexual assault—that is, it would not have "existed in a vacuum of his own self-interest." *Ackley*, 497 Mich at 397. The failure to investigate deprived Jones of the tools he needed to raise an adequate defense at trial; as such, we conclude that the failure sufficiently undermined confidence in the outcome to warrant a new trial.

## III. CONCLUSION

The trial court did not err when it determined that Jones's failure to investigate fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for the unprofessional error, the outcome of the proceeding might have been different. Consequently, it did not abuse its discretion when it granted defendant's motion for a new trial on that basis. Because the trial court did not abuse its discretion by granting defendant's motion for a new trial, we need not address whether defendant's remaining claims of error would also warrant a new trial.

The trial court's order granting defendant a new trial is affirmed, defendant's conviction and sentence are vacated, and the case is remanded for a new trial. We do not retain jurisdiction.


/s/ Michael F. Gadola